752 A.2d 799 (2000)
332 N.J. Super. 18
In the Matter of Kelly KIETUR
Superior Court of New Jersey, Appellate Division.
Submitted May 24, 2000.
Decided June 14, 2000.
*801 John J. Farmer, Jr., Attorney General, for appellant Division of Medical Assistance And Health Services (Michael J. Haas, Assistant Attorney General, of counsel; Jack S. Senechal, Deputy Attorney General, on the brief).
Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte, Chatham, for respondent Kelly Kietur by her Guardian Ad Litem, Gilma Kietur (John M. Blume, of counsel; Daryl L. Zaslow, on the brief).
Before Judges KING, CARCHMAN and LEFELT.
*800 The opinion of the court was delivered by LEFELT, J.S.C. (temporarily assigned).
The Division of Medical Assistance and Health Services ("DMAHS") appeals from the denial of its motion for partial withdrawal of funds from the Bergen County Surrogate's Custodial Account for Minors. The funds were placed in the account on behalf of Kelly Kietur ("Kelly") as a result of a medical malpractice settlement with the medical care providers who allegedly caused Kelly spastic dysplasia and mental retardation at her birth. DMAHS claimed entitlement to $18,480.59 of the settlement funds as reimbursement for Medicaid payments DMAHS made to Kelly. We reverse the motion judge's denial and direct that DMAHS be reimbursed.
We recount the relevant facts. On February 27, 1989, the Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte law firm ("Blume Goldfaden") filed a medical malpractice complaint on behalf of Kelly and her parents against the doctors and other medical care providers that rendered medical assistance during Kelly's August 28, 1980 birth. From August 4, 1981, through December 2, 1986, DMAHS claimed it disbursed $24,640.78 for the medical care and services necessary to treat Kelly's severe brain injuries.
On July 10, 1987, Blume Goldfaden notified DMAHS that it had filed suit on behalf of Kelly, and requested a copy "of all payments made on behalf of Kelly Kietur from August 28, 1980 to date." About one month later, in an August 19, 1987 letter, DMAHS acknowledged Kelly's suit, stated Medicaid disbursements to Kelly totaled $28,423.75, and indicated that "[a] complete listing of treating Providers is forthcoming." This correspondence also provided that although "[DMAHS is authorized] to pursue an independent right of action against the defendant, we seek your cooperation in the disbursement of funds in order to avoid additional litigation." The letter concluded that "[u]pon settlement of this case, the check should be made payable to the `Treasurer, State of New Jersey.'"
By January 12, 1988, Blume Goldfaden had not received the promised list of medical providers, and the firm wrote requesting that DMAHS "forward that list to [Blume Goldfaden] as soon as possible." Without the promised list of providers, Blume Goldfaden settled the medical malpractice claim against Kelly's physicians for $400,000, and judgment was entered on April 20, 1989. Blume Goldfaden did not notify DMAHS of the settlement, nor did it specifically provide for any DMAHS reimbursement in the settlement.
The April 20, 1989 settlement order entered judgment in favor of Gilma Kietur, individually and as guardian for Kelly, against the defendant medical care providers in the amount of $150,000. This $150,000 was allocated as follows: (1) $16,493.79 to Blume Goldfaden for reimbursement of costs; (2) $95,879.05 to Blume Goldfaden for attorneys' fees; and (3) $37,637.16 to Gilma Kietur, Kelly's mother, for Gilma's past and future losses and expenses. Additionally, the order awarded $50,000 to Kelly's guardian, Gilma, to be paid to the Bergen County Surrogate's Custodial Account for Minors. The remaining $200,000 was structured. The order provided that Gilma Kietur, as guardian for Kelly, would receive $1,022.55 per month, increasing by 3% compounded annually, for Kelly's lifetime *802 or for thirty years, whichever was longer, and these payments were to be deposited into the Bergen County Surrogate's Custodial Account for Minors. The order did not mention or reference DMAHS's Medicaid claim or any medical expenses.
On October 16, 1991, DMAHS wrote Blume Goldfaden stating, "[w]e have been informed that this case has been settled without our lien being satisfied. The Division requests a copy of the settlement distribution sheet and the reason why the lien was not satisfied upon settlement." This correspondence also requested the name, address and phone number of the malpractice defendant and his attorney. The record does not contain a response from Blume Goldfaden to DMAHS's letter.
Seven years later, on August 27, 1998, after DMAHS traced Kelly's settlement funds to the Bergen County Surrogate's Court, DMAHS filed a motion for partial withdrawal of funds. DMAHS's medical review analyst gathered Kelly's treatment records for 1981 to 1986 from Hackensack Medical Center and compared these records to the charges listed on Kelly's Medicaid "Recipient Profile Report." From the approximately $30,000 in itemized charges on Kelly's Recipient Profile Report, the analyst separated $24,640.78 in charges allegedly associated with services for injuries related to Kelly's malpractice claim. After a pro rata reduction for DMAHS's share of attorneys fees, its total claim for reimbursement equaled $18,480.59. Blume Goldfaden appeared and opposed DMAHS's motion.
When the motion was heard on November 4, 1998, the Surrogate's account contained over $200,000. John Blume certified that
[t]he monies deposited with and paid to the Surrogate of Bergen County represented a small portion of the damages sustained by Kelly Kietur, and were only partial compensation for her pain and suffering and disability. No portion of those funds was contemplated to be for past, present, or future medical costs....
The motion judge noted that Kelly had reached the age of majority as of August 28, 1998 and would be entitled to periodic payments under the settlement terms. In denying DMAHS's claim, the judge stated that to "carve out" DMAHS's funds "nunc pro tunc " from the settlement, "the court would have to revisit the entire settlement concept, modify the judgment, reallocate the funds and redisburse[,]" but he did "not have the necessary underlying information ... conceptually to do that now some 11 years after the fact." The judge concluded that the funds in the Surrogate's account were "specifically earmarked" for Kelly's pain and suffering and her future needs, and these funds were "not accessible by the Division merely because they are convenient and available and the Division has a claim." The first issue we address, therefore, is whether the motion judge erred in determining that federal and State law do not require that DMAHS be reimbursed for the Medicaid payments expended on behalf of Kelly.

I.
"Medicaid is a medical assistance program for eligible-low income individuals, established by Subchapter XIX of the federal Social Security Act," 42 U.S.C.A. §§ 1396a-1396v. Waldman v. Candia, 317 N.J.Super. 464, 470, 722 A.2d 581, certif. granted, 158 N.J. 686, 731 A.2d 45 (1999). This "program is administered jointly by the federal and state governments." Ibid. While states are not required to participate in the program, once they elect to join, the state program must have the federal government's approval and it must comply with the federal criteria. Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784, 794 (1980); Waldman, supra, 317 N.J.Super. at 470-71, 722 A.2d 581; County of Camden v. Waldman, 292 N.J.Super. 268, 278, 678 A.2d 1101 (App.Div.1996), certif. denied, 149 N.J. *803 140, 693 A.2d 109 (1997). New Jersey participates in Medicaid and our State program is located at N.J.S.A. 30:4D-1 to -19.1.
The Department of Human Services, through DMAHS, is designated as the single state agency to administer New Jersey's Medicaid program. N.J.S.A. 30:4D-5. The federal criteria provide that a state shall "take all reasonable measures to ascertain the legal liability of third parties ... to pay for care and services available under the plan," and, when appropriate, to "seek reimbursement for such assistance to the extent of such legal liability[.]" 42 U.S.C.A. §§ 1396a(a)(25)(A) and (B). Consequently, the Commissioner of the Department of Human Services is authorized and empowered to use "all reasonable measures to ascertain the legal or equitable liability of third parties to pay for care and services" of the recipient and, where appropriate, to seek reimbursement. N.J.S.A. 30:4D-7k.
Further, "every recipient or his legal representative shall promptly notify [DMAHS] of any recovery from a third party and shall immediately reimburse [DMAHS] in full from the proceeds of any settlement ... in any action or claim initiated against any such third party...." N.J.S.A. 30:4D-7.1b. Moreover, "every recipient, as a condition of eligibility for medical assistance under this act, is hereby deemed to have assigned to the commissioner any rights to support for the purpose of medical care as determined by a court ... and any rights to payment for medical care from any third party." N.J.S.A. 30:4D-7.1c. Finally, unlike N.J.S.A. 30:4D-7.2, which contains the requirements for DMAHS to file a lien against Medicaid recipient's estates, no statutory requirements are imposed upon DMAHS to perfect a lien against a living Medicaid recipient who recovers monies from a liable third party.
In Hedgebeth v. Medford, 74 N.J. 360, 378 A.2d 226 (1977), a case decided before the enactment of N.J.S.A. 30:4D-7.1, the Court held that when the State exercises its right of subrogation under the Medicaid program, equitable principles govern, and in seeking reimbursement, the State must pay its pro rata share of the recipient's counsel fees.
The Court further indicated that it interpreted the Medicaid act as providing the State with "two avenues by which it may seek reimbursement for Medicaid payments: it may either institute an action directly against the tortfeasor who is liable for the medical expenses or seek recovery by way of the Medicaid recipent through a right of subrogation." Id. at 365, 378 A.2d 226. The Court added that the legislative history of New Jersey's Medicaid program suggested "an unmistakable intent to afford the State every opportunity to recoup its payments from third parties." Id. at 366, 378 A.2d 226. The Court also refused to distinguish an award to a parent from an award to a child by stating:
We are satisfied that both awardsto the mother and the infantshould be treated alike for the purposes of the State's claim. Even if a technical distinction exists between the awards made to the mother and child, such an argument runs counter to the overriding purpose of the statute.

[Id. at 374, 378 A.2d 226.]
Thus, under Hedgebeth, all of the settlement proceeds are available for reimbursement of the State's Medicaid payments. Accord Waldman, supra, 317 N.J.Super. at 475, 722 A.2d 581. See also Lusby v. Hitchner, 273 N.J.Super. 578, 591, 642 A.2d 1055 (App.Div. 1994) (stating "a plaintiff could not in any case pocket a double recovery for medical expenses for the reason that his entire recovery is subject to Medicaid's reimbursement rights.")
Finally, in Waldman, supra, 317 N.J.Super. at 468-69, 722 A.2d 581, DMAHS notified the families of two disabled young women of its Medicaid reimbursement claim, and DMAHS was subsequently notified of a settlement that accounted for its *804 reimbursement claim. We held that the settlement proceeds could not be transferred to the Medicaid recipients' special needs trusts before satisfaction of the State's subrogation right. Id. at 473-74, 722 A.2d 581. We further indicated that adjudication of third party liability was not a "prerequisite to invocation of the State's lien rights." Id. at 474, 722 A.2d 581.
Thus, under the applicable statutes and cases, DMAHS is entitled to reimbursement for Medicaid payments made to Kelly. Approximately one month after Blume Goldfaden notified DMAHS that it had filed suit on behalf of Kelly, DMAHS requested that upon settlement of the case, a check be issued to cover reimbursement for its Medicaid disbursements to Kelly. DMAHS's request for reimbursement was within the period federal law permits for this action. 42 C.F.R. § 433.139(d)(2).
In addition, like Waldman, Kelly was on notice that DMAHS sought reimbursement. Unlike Waldman, however, Blume Goldfaden failed to provide DMAHS with notice that the case settled and did not account for DMAHS's lien in the settlement. This action was taken despite N.J.S.A. 30:4D-7.1c whereby Kelly "assigned to the commissioner ... any rights to payment for medical care from any third party[,]" and N.J.S.A. 30:4D-7.1b, which requires prompt notification of any recovery from a third party and immediate reimbursement to DMAHS.
Moreover, despite the motion judge's determination that the funds in the Surrogate's account were earmarked for pain and suffering and future needs, Hedgebeth, Waldman and Lusby dictate that all of the settlement proceeds, regardless of how they are characterized, are available to the State for its Medicaid reimbursement claim. And, according to Waldman, the State's subrogation rights should have been satisfied before any transfer of funds elsewhere.
Therefore, we disagree with the motion judge and conclude that DMAHS is entitled to reimbursement. Because we are faced with DMAHS's request for reimbursement of Medicaid payments made over fourteen-years ago, we exercise our original jurisdiction, R. 2:10-5, and proceed to consider Kelly's remaining defenses, even though the motion judge did not address them.

II.
First, Blume Goldfaden argues that DMAHS is not entitled to reimbursement because DMAHS's motion for partial withdrawal was barred by the statute of limitations. The parties both agree, however, that N.J.S.A. 2A:14-1.2 provides the appropriate ten-year statute of limitations, yet, they disagree as to the accrual date of the cause of action.
DMAHS contends that its claim did not accrue until April 20, 1989, when the Order of Judgment was entered. Thus, because DMAHS filed its motion on August 27, 1998, it was within the applicable limitation period. Kelly asserts that the action accrued on August 19, 1987, when DMAHS notified Blume Goldfaden of its reimbursement claim and, therefore, the action is barred.
N.J.S.A. 2A:14-1.2a provides, in pertinent part, that "any civil action commenced by the State shall be commenced within ten years next after the cause of action shall have accrued." The ten-year limitations period applies to actions brought by the State unless it is "expressly and specifically" clear that another limitations period applies. N.J.S.A. 2A:14-1.2a; State, Dep't of Envtl. Protection v. Larchmont Farms, Inc., 266 N.J.Super. 16, 34, 628 A.2d 761 (App.Div.1993), certif. denied, 135 N.J. 302, 639 A.2d 301 (1994).
As explained in New Jersey Transit Corp. v. Borough of Somerville, 139 N.J. 582, 586-87, 661 A.2d 778 (1995), the tenyear limitation period was established by the Legislature after a trio of 1991 cases abolished the common law doctrine of nullum tempus occurrit regi or "no time runs against the king." Holloway v. State, 125 *805 N.J. 386, 593 A.2d 716 (1991); New Jersey Educational Facilities Auth. v. The Gruzen Partnership, 125 N.J. 66, 592 A.2d 559 (1991); and Devins v. Borough of Bogota, 124 N.J. 570, 592 A.2d 199 (1991). Before these cases, the State had been exempt from the statutes of limitations generally applicable in civil actions.
Interestingly, however, N.J.S.A. 2A:14-1.2b also provides that, "[f]or purposes of determining whether an action subject to the limitations period specified in subsection a. of this section has been commenced within time, no such action shall be deemed to have accrued prior to January 1, 1992." As we previously explained, by delaying the accrual date of any cause of action until January 1, 1992, the Legislature allowed "governmental entities ample time for evaluation of pending matters." State v. Cruz Constr. Co., Inc., 279 N.J.Super. 241, 248, 652 A.2d 741 (App.Div.1995). Consequently, while the Legislature restricted State actions to a tenyear limitation period, agencies were also provided with sufficient time to assess those actions the State contemplated commencing. Therefore, in this case, no cause of action could accrue on behalf of the State until after January 1, 1992. DMAHS had tenyears from that date to evaluate its reimbursement action against Kelly.
No one disputes that Kelly's underlying medical malpractice claim against the medical care providers was timely. Likewise, DMAHS timely requested subrogation from Kelly. Moreover, no other limitations period "expressly and specifically" applies to DMAHS's Medicaid reimbursement claim. Therefore, DMAHS's claim was not barred by the statute of limitations because under N.J.S.A. 2A:14-1.2b the statute will not cease running until December 2001.

III.
Kelly also argues that laches bars DMAHS's reimbursement. Kelly asserts that DMAHS's delay in seeking to withdraw settlement funds was unreasonable because more than twelve years have elapsed since DMAHS was put on notice of the underlying medical malpractice claim, more than thirteen years have elapsed since DMAHS made its final Medicaid payment to Kelly, and DMAHS delayed more than a decade before asserting its claim for withdrawal of funds from the Surrogate.
Laches has been found where an inexcusable and unexplainable delay in enforcing a known right prejudiced the other party because of such delay. County of Morris v. Fauver, 153 N.J. 80, 105, 707 A.2d 958 (1998). Laches is an equitable defense "that may be interposed in the absence of the statute of limitations." Lavin v. Hackensack Bd. of Educ., 90 N.J. 145, 151, 447 A.2d 516 (1982). Thus, the "time constraints of laches, unlike the periods prescribed by the statute of limitations, are not fixed but are characteristically flexible." Ibid. Factors considered in determining whether to apply laches include the length of delay, the reasons for delay, and "changing conditions of either or both parties during the delay." Id. at 152, 447 A.2d 516.
While Kelly is correct that over twelve years have elapsed since DMAHS was notified of the underlying medical malpractice claim, Blume Goldfaden caused some of the delay in this case. Had Blume Goldfaden complied with its statutory duty under the Medicaid program to promptly notify DMAHS of the April 1989 settlement with the third party tortfeasors, much of the delay in this case may have been avoided. Instead DMAHS did not learn of the settlement until October 1991, more than two-and-a-half years later. Even after requesting a copy of the settlement agreement in October 1991, Blume Goldfaden did not respond to this request. DMAHS was left to its own devices to locate the settlement agreement, thereby resulting in additional delay.
Yet, DMAHS knew it had a right to reimbursement as early as August 1987.
*806 Assuming it took DMAHS until early 1992 to organize its reimbursement claim after finally learning of the settlement, more than six years passed before DMAHS filed its motion to withdraw funds from the Surrogate's account. DMAHS offered no explanation for this extraordinary delay.
We are not unmindful of the severe injuries that Kelly must endure. Blume Goldfaden indicated that her case was valued at between four and seven million dollars, but settled for $400,000 because of "severe liability questions." On one hand, we are loath to reduce any of Kelly's recovery. On the other hand, DMAHS, wisely, does not seek to recover any of the interest earned on the funds that DMAHS was entitled to over eleven-years ago. If Blume Goldfaden had promptly notified DMAHS of the settlement and DMAHS had acted reasonably expeditiously, Kelly would have had to reimburse DMAHS with pre-structured funds. She would not have benefitted from the interest these funds have accrued over the years of delay. We find, therefore, that DMAHS's extraordinary delay is ameliorated, in part, by the benefit of the structure principal and the interest earned on the funds that Kelly will retain. Consequently, we conclude, on balance, that equity does not compel the application of the laches doctrine in this case.

IV.
Kelly further argues that DMAHS failed to provide sufficient proof that the medical expenses paid by Medicaid positively relate to the underlying medical malpractice claim. Specifically, Blume Goldfaden was concerned with twenty-two of the sixty-one entries calculated by DMAHS's medical review analyst because seventeen entries contained the notation "ENT" or ear, nose and throat, and five entries had the notation "PEDIATRICIAN."
Although Blume Goldfaden argues that twenty-two entries were questionable or 35% of the entries, these entries totaled only $532. Further, Blume Goldfaden did not offer any specific proof refuting DMAHS's calculations or offer another means of calculating the Medicaid payments. The medical review analyst's method of comparing Kelly's treatment records with her Medicaid "Recipient Profile Report" appears to be a reasonable method for calculating Medicaid payments. Nevertheless, there is nothing in the record explaining how the "ENT" or "PEDIATRICIAN" entries, objected to by Blume Goldfaden, were related to the medical malpractice. Therefore, in the interest of fairness, we reduce DMAHS's reimbursement by $532, and remand to the Law Division solely to enter judgment directing the Surrogate to reimburse DMAHS $18,081.59 ($24,640.78 [total Medicaid payments]$532 = $24,108.78 X .75 [attorney fee] = $18,081.59).
In conclusion, we stress that in the future DMAHS must act promptly to assert its reimbursement claim. Much of the legal and factual confusion present in this case was caused by DMAHS's inordinate delay in advancing its lien. While we were able to excuse DMAHS's delay in this case, the practice followed herein by the agency should not be emulated in the future. Nevertheless, when advised of the existence of such a claim, an attorney cannot simply disregard the claim, but must take appropriate action to ensure that DMAHS's legitimate interests are addressed and satisfied from any settlement proceeds.
Reversed and remanded for further proceedings consistent with this decision.