966 A.2d 29 (2009)
405 N.J. Super. 547
John K. CHANCE and Irene P. Chance, As Co-Executors of the Estate of Keron D. Chance, Deceased, Plaintiffs-Respondents,
v.
Kevin P. McCANN, Defendant-Appellant.
No. A-1155-07T3.
Superior Court of New Jersey, Appellate Division.
Argued October 8, 2008.
Decided March 11, 2009.
*32 Bruce E. Helies, Manasquan, argued the cause for appellant (Wolff, Helies, Duggan, Spaeth and Lucas, attorneys; Mr. Helies, of counsel and on the briefs; Michael J. Fioretti, Bridgeton, and G. William DeLaney, on the briefs).
William G. Wright argued the cause for respondents (Capehart & Scatchard, P.A., attorneys; Mr. Wright, Mt. Laurel, on the brief).
Before Judges STERN, RODRÍGUEZ and WAUGH.
The opinion of the court was delivered by
WAUGH, J.S.C. (temporarily assigned).
Defendant Kevin P. McCann appeals a judgment in the principal amount of $852,123.18 in favor of the Estate of Keron D. Chance, McCann's deceased law partner. McCann and Chance practiced law together from 1978 to 1998. The judgment was based upon a partnership agreement and a promissory note arising out of the partnership agreement. The Estate was granted summary judgment on its claim, while the two counts of McCann's counterclaim for breach of the partnership agreement by Chance were decided against him by summary judgment as to count two and jury trial as to count one. We reverse and remand for a trial on the merits of the Estate's claims against McCann and a new trial on the first count of McCann's counterclaim. We affirm the order for summary judgment dismissing the second count of McCann's counterclaim.

I
We discern the following facts from the record before us.[1] In September 1978, Chance and McCann formed a partnership under the name of Chance & McCann, with its office located in Bridgeton. Chance and McCann owned the building in which they practiced through an entity known as 201 Associates. After almost twenty years of practicing together, their partnership was dissolved as of October 31, 1998.
During most of its existence, the partnership operated without a written partnership agreement. According to McCann, their oral understanding was that all legal fees and other income received by the partnership would be deposited into the partnership bank account. Each partner was permitted to withdraw funds from the account in proportion to the fees he generated, and McCann withdrew significantly more than Chance. However, when the partnership's income was reported to the Internal Revenue Service and the State of New Jersey for income tax purposes, it was reported as if the partners had divided the income equally. The result was that Chance was paying taxes on a greater percentage of the income than he was actually receiving.

A
Beginning in 1994, Chance approached McCann and initiated discussions regarding the preparation of a written partnership agreement. Chance prepared several drafts of the proposed agreement, but left blank the dollar amounts with respect to the key financial provisions. According to McCann, he and Chance discussed at various times the proper dollar amounts to be inserted into those blanks. That process appears to have taken place over several years, inasmuch as the agreement was not *33 signed until July 20, 1998. Nevertheless, the agreement has an effective date of January 1, 1994.
There appear to have been four primary purposes for the creation of the partnership agreement. The first was to address the imbalance between the actual distribution of the firm's income and the reporting of that income for tax purposes. The second was to formalize the parties' relationship in anticipation of the dissolution of the partnership, after which the practice would continue under the same name, but with McCann as its sole practicing attorney. Chance was to have the right to use the facilities and to retain any legal fees he earned. The third was to arrange the sale to McCann of the building in which the firm's law office was located. And the fourth was to provide for the payout of Chance's capital account over time.
McCann maintains that he suggested to Chance that he pay Chance $160,000 to reflect the following: (1) the balancing of the capital accounts and (2) Chance's cooperation in the continuation of the practice after his retirement. Chance disagreed and wanted to use the figure of $630,000.[2] According to McCann, Chance made several representations with respect to that figure, including: (1) that the number was suggested by his accountant for tax purposes; (2) that he knew he was not entitled to that amount; (3) that he would never seek to enforce the agreement; (4) that he would consider the debt fully paid at $160,000; and (5) that he would inform his children that the agreement for $630,000 was not enforceable.
The agreement as signed by McCann and Chance used the $630,000 figure requested by Chance. McCann, however, contends that he executed the partnership agreement in reliance on Chance's assurances that he would only seek to collect $160,000, despite the provisions of the written partnership agreement stating the higher amount.
The Estate, of which Chance's two children are the executors, disputes that such representations were made, arguing that the figure of $630,000 was intended to be binding on the parties. The Estate also argues that McCann is, in any event, precluded by the parol evidence rule from seeking to vary the terms of the written partnership agreement by offering testimony about Chance's contrary statements. See Conway v. 287 Corporate Ctr. Assocs., 187 N.J. 259, 268, 901 A.2d 341 (2006) ("In general, the parol evidence rule prohibits the introduction of evidence that tends to alter an integrated written document.").
The partnership agreement also provided for the conveyance of the real estate owned by Chance and McCann through 201 Associates to McCann alone, for an additional sum of $30,000. McCann was to assume sole responsibility for the mortgage on the property. The partnership agreement as executed required payments by McCann to Chance, in addition to $30,000 for the office building, as follows: (1) an initial payment of $20,000 payable at the time of settlement on the real estate transaction; and (2) subsequent weekly installments of $1,000, beginning on August 1, 1998, and continuing until the full sum had been satisfied. The partnership agreement called for interest at six percent on any weekly payment more than ten days overdue.
In order to facilitate a full understanding of the factual and legal issues presented on this appeal, even at the risk *34 of some repetition, we quote extensively from the relevant provisions of the agreement:
2. The parties acknowledge that personal Federal and State Income Tax Returns have heretofore been filed by each of them and Income Tax has been paid by each of them in some years based upon an equal allocation of income, notwithstanding incurring expenses and production of income in unequal amounts and unequal withdrawals of Partnership funds. Accordingly, adjustment of the Partnership account has now been determined and agreed upon and there is due to Chance as of August 1, 1998, an amount of $630,000.00.
3. The parties agree that no further adjustment shall be made between them for any expenses related to the operation of their practice of Law, including accounts receivable and work in progress; unless mutually agreed to in writing or mandated to by some Government Agency.
4. The parties mutually acknowledge and agree that they have practiced Law together for almost twenty years. During that period of time there has developed business and professional relationships which it is in the best interests of both parties to see that they continue. For the continued life of their professional, business and personal relationship both parties shall use their best efforts to make sure that these relationships remain and prosper so that the continuing business equity shall be viable and in a position to generate funds to pay the capital account as set forth above.
5. The parties acknowledge that the income generated to them and the withdrawals made by them have been unequal in amount and that the withdrawals do not accurately reflect their percentage of ownership in the Partnership as set forth in the Federal and State Tax Returns as of the time they were filed, excepting Returns for the tax year 1994 to date. The agreement set forth in this document shall serve to overcome these inequities and the parties intend that the payments made to Chance since January 1, 1994 and to be made under the terms hereof will be withdrawals of capital and therefore not subject to Federal and State Income Tax. If prior, present and future Tax Laws should apply to adversely affect this result then the parties will in good faith make a corresponding adjustment between them.
6. From time to time each of the parties have loaned money to the Partnership of Chance & McCann, and the principal amount of all such sums has been paid, excepting a balance still due to Chance in the amount of $7,239.36.
7. From and after the date of this effective date of this Agreement, January 1, 1994, Chance has not received any income and shall not share in the profits or losses, or be responsible for any obligations of the partnership of Chance & McCann. Nevertheless, he has received and may continue to receive for his own use remuneration for professional services performed by him on a case by case basis, provided expenses incurred therewith and paid by the Partnership shall be credited against the capital account of Chance.
....
9. The real estate located at 201 West Commerce Street, Bridgeton, New Jersey, is presently owned by them and operated through a separate Partnership known as 201 Associates. Upon the execution of this Agreement, and in consideration of the terms hereof, Chance shall convey to McCann all of the interest of Chance in the aforesaid real estate, *35 subject to the existing Mortgage which McCann shall pay at settlement, and in addition McCann shall pay to Chance at settlement the amount of $30,000.00 whereupon the Partnership of 201 Associates shall be dissolved.
10. It is agreed that at settlement as aforesaid McCann shall pay to Chance the sum of $30,000.00 and shall also repay the amount of the loan referred to in Paragraph 6 above. It is further agreed that McCann will in good faith provide for additional payments to Chance to liquidate the obligation set forth in Paragraph 2 above $20,000.00 payable at said settlement and the balance payable in [blank] weekly installments of $1000.00. These payments shall continue until the full amount due has been paid to Chance and shall not bear interest if installments are made when due. If any installment becomes past due for more than ten (10) days suc[h] installment shall bear interest at the annual rate of six (6%) percent from the due date until paid. The first installment shall become due on August 1, 1998, and subsequent payments shall be due weekly, thereafter. As additional evidence of this obligation McCann shall execute and deliver to Chance upon the execution of this Agreement a Promissory Note and a purchase money Mortgage covering said real property, to secure payment thereof and performance of this Agreement, which Mortgage shall cover the one-half interest conveyed by Chance to McCann and the one-half interest owned by McCann, provided if McCann elects to borrow funds to be secured by a first Mortgage on said property and such funds are used to pay to Chance the obligation as aforesaid, then Chance shall subordinate his Mortgage to the first Mortgage given to secure the borrowed funds.
11. Notwithstanding conveyance by Chance to McCann of his interest in the office property and any of the other terms hereof, it is understood and agreed that each of the parties shall continue to have the unrestricted equal right, jointly and with the other party, to use the real property at 201 West Commerce Street and the personal property owned by either of the parties or by the Partnership of Chance & McCann as heretofore until all of the terms of this Agreement has been satisfied.
12. McCann does hereby assume all existing or future obligations of the Partnership of Chance & McCann and the Partnership of 201 Associates heretofore and hereafter incurred and hereby agrees to hold Chance harmless from any and all present and future liabilities.
....
14. The parties shall jointly continue to have the same uninterrupted use of the office building and appurtances and personal property as heretofore, which building is now occupied by them, and McCann shall pay or provide for payment of all expenses related to the building....
15. In the event of default by McCann in fulfilling the provisions of this Agreement, Chance may, at his option, at any time, remove from the aforesaid office all or part of the items of personal property owned by him, exclusive of confidential legal files owned by him and now used by the Partnership. In the event of his death, this right may be exercised by his Executor(s) for a period of 90 days thereafter. If this option is not exercised by Chance or his Executor(s) such items shall [be] the sole property of McCann.
16. The parties understand that the continuing relationships, both business *36 and professional, of Chance & McCann are in their joint best interests and both shall use their best efforts to promote those relationships now and in the future for the financial benefits of the parties.
....
18. Upon dissolution of the Partnership of Chance & McCann the firm name may be retained by McCann and he shall thereupon form a professional corporation or continue practice in any form of his choice, and in this event he shall provide adequate notice to clients and creditors and hold Chance harmless from such obligations in legally sufficient form satisfactory to Chance.
19. In the event that Kevin P. McCann should wish to refinance the property known as 201 West Commerce Street at a date subsequent to August 1, 1998, and all obligations pursuant to this Agreement have been met and are current, then Kevin P. McCann shall have the option to refinance providing that twenty-five percent of the new loan [proceeds] shall be paid to Keron D. Chance or his estate. If the agreement is in default the parties shall re-negotiate the percentage of payment to Keron D. Chance or his estate.
20. McCann does hereby personally guarantee performance of his part of this Agreement.
21. Chance does hereby personally guarantee performance of his part of this Agreement.
22. Mere passage of time or delay in seeking a remedy shall not be construed as a waiver of any default in the terms of this Agreement.

B
At the September 18, 1998, real estate settlement, McCann executed the promissory note and mortgage, required by Paragraph 10 of the agreement to secure his financial obligations under the partnership agreement. Although McCann contends that Chance agreed not to record the mortgage, Chance recorded it on December 16, 1998.[3] In conjunction with the signing of those documents and the deed for the real property, McCann paid Chance the $30,000 for the purchase of the property and the $20,000 initial payment due under the partnership agreement.
On November 24, 1998, Chance drafted a letter to the President of Cumberland Mutual Fire Insurance Company, one of his principal clients, announcing the dissolution of the partnership. Spaces for Chance and McCann's signatures appear at the end of the draft letter. However, McCann claims that he told Chance he did not want to send the letter out because it failed to represent adequately McCann's intent to continue providing legal services to that client. It appears that this letter was never sent out.
On December 22, 1998, at Chance's instruction and without McCann's personal knowledge, Chance's secretary sent similar letters to approximately seven clients informing them of the partnership's dissolution. Those letters only contained Chance's signature. Each letter stated that, although the partnership had been dissolved, McCann would still "be available *37 to provide legal services as heretofore," and that Chance would remain "Of Counsel." However, after receiving the letters, at least two of Chance's clients, Cumberland Mutual and Colonial Bank, retained other law firms to represent them.
When he learned about the December 1998 letters, McCann refused to make any further $1,000 payments to Chance. He had already made a total of eighteen such payments, the last of which was made in January 1999. According to McCann, Chance acknowledged that he breached the agreement and promised not to seek further payments from McCann. Chance took no legal action against McCann after he stopped making the payments. Approximately four years later, on February 17, 2003, Chance passed away.
Chance's will was admitted to probate and his children were named as co-executors. They discovered the partnership agreement and related financial documents among their father's effects. They concluded that McCann owed the Estate $852,123.18, including accrued interest, pursuant to the terms of the agreement.

C
The Estate filed a two count complaint against McCann in June 2003, seeking (1) to collect the amounts due under the partnership agreement and the note and (2) to foreclose the mortgage and gain possession of the firm's office building.[4] McCann ultimately filed an amended answer in March 2005. He denied the material allegations of the complaint and raised affirmative defenses, including: (1) laches; (2) waiver; (3) estoppel; (4) statute of frauds; (5) accord and satisfaction; and (6) excuse of further performance by defendant based upon defendant's prior breach.
McCann's pleading also included a counterclaim against the Estate. The first count alleged that Chance breached his obligation, under Paragraph 16 of the partnership agreement, to encourage existing clients to continue their relationship with the firm once he retired. The second count alleged that, prior to execution of the partnership agreement, Chance improperly diverted fees into his personal account that should have been deposited into the firm's account.
In early 2006, following discovery, the parties filed cross-motions for summary judgment. The motions were argued and decided on June 9, 2006, with the resulting order entered on July 10, 2006. The motion judge granted the Estate's motion for summary judgment on its claim under the agreement and corresponding note, and denied McCann's motion to dismiss that claim. He also granted the Estate's motion to dismiss count two of the counterclaim. However, the motion judge denied the Estate's motion as to count one of the counterclaim, concluding there were genuine issues of material fact as to whether Chance breached his obligation to help retain the firm's clients following his retirement. The resulting order granting summary judgment to the Estate did not establish the amount due to the Estate from McCann, the motion judge having crossed out the amount set forth in the Estate's proposed order.
The motion judge explained his reasons as follows:
I find that Mr. McCann, as well as Mr. Chance, when the agreement was executed in July of 1998 and when the note was executed three months later in September of 1998, reached [an] agreement between them as to what the obligation *38 was of Mr. McCann to Mr. Chance and they reduced it entirely to writing, a writing that provided there would be a promissory note and provided that italso bear the security of a mortgage.
I find there is no basis for any admission of any oral or parol evidence to contradict the clear method by which it was arrived upon. There has been no showing that there is an absence of consideration of this since it clearly recited itself that the parties obviously were co-owners of a law partnership which had existed for 20 years and which was now to be purchased by Mr. McCann from Mr. Chance as to his interest.
The parties have entered into a written agreement. The agreement recites the method by which it was arrived upon and what it covers [which is v]irtually all of the items of relationship between these parties, both in their ownership of real property and also [their] law practice....
Nor are there any defenses of estoppel or laches. These parties certainly commenced the suit in an expeditious manner upon their appointment as executors of the estate.
If there were to be any adjustment in the written agreement, it needed to be in writing. It needed to be before the this is not merely a written agreement, but this is also the execution of a promissory note, and the promissory note itself executed in September of 1998 and based upon consideration, adequate consideration, becomes an obligation to pay so that the basis for summary judgment in favor of plaintiffs in this case is all the stronger by virtue of the fact that the defendant has also signed the promissory note of the obligation, and therefore the plaintiffs are entitled to summary judgment on the liability under the note, the note that is incorporated in the terms of the agreement between the parties.
As to the counterclaim against the damages for violation of the note, the terms of the agreement, we actually know they are two in nature. One is that the recipient of the purchase of the partnership had unilaterally diverted to himself a portion of that ... amount to which he was entitled under the agreement of 630,000 from the capital account prior to the execution of the promissory note as well as the agreement. But the agreement itself provides that the decedent during the effective term of the agreement was entitled to the income which he had received from his work as a lawyer from clients, noting that he had not been receiving the profits from the partnership during that period of time.
There has been produced as part of discovery no evidence of any diversion to the decedent of funds other than legal fees or costs ofin work in which he was engaged himself pursuant to the terms of the agreement. I am going to grant summary judgment dismissing the counterclaim for diverted revenue. The agreement provides for revenue to be separately received by Mr. Chance, the decedent, and very clearly sets forth those terms. There's no other evidence being presented in discovery other than Mr. Chance receiving those funds pursuant to the terms of the agreement.
As to the [counterclaim] ... for damages for violation of the terms of the agreement for not promoting the practice which Mr. Chance was purchasing, I believe that there has been sufficient evidence presented to the Court that would survive the summary judgment that a fact finder might consider in determining whether or not the counterclaim for damages for violating the term *39 of the agreement concerning using best efforts to promote the posterity of the firm and that is pursuant to ... Paragraph 4, and I find that that is for a fact finder to determine whether or not there was a breach of that agreement violating the terms of that agreement, causing any damages to counterclaimant to promote or alternatively whether there was interference with that agreement to promote the posterity of the agreement.
Shortly thereafter, McCann moved for reconsideration. The motion was argued on September 8, 2006. The motion judge issued a letter opinion on February 6, 2007, denying the motion. The motion judge rejected McCann's contention that the Supreme Court's then recent decision in Conway, supra, 187 N.J. 259, 901 A.2d 341, permitted the introduction of parol evidence to support McCann's claim that he and Chance had agreed upon an amount substantially lower than that contained in the written partnership agreement. He pointed to the fact that McCann was seeking to use parol evidence to vary the explicit terms of the agreement, rather than as an aid in understanding the contractual language, as was the case in Conway. See id. at 269, 901 A.2d 341. The motion judge also addressed and rejected McCann's contention that the parol evidence rule did not bar evidence about Chance's actions prior to the execution of the partnership agreement.
McCann's remaining claim, that Chance breached his obligation to encourage clients to continue to use the services of the firm after his departure, was then assigned for trial before a different judge. Prior to the start of the trial, a disagreement arose between the parties as to whether or not the Estate had an obligation to prove its damages under the partnership agreement and note, or whether they were subject to arithmetical calculation, i.e., unpaid principal plus accrued interest.[5] In an effort to resolve that dispute, the trial judge requested that the motion judge "clarify" his summary judgment order with respect to the amount of damages on the Estate's claim. The motion judge then issued an order setting damages at "$852,123.88, plus interest from March 31, 2006," subject to any offset from the counterclaim in the event McCann was to be successful at trial. There was no written or oral opinion explaining the basis of the calculation, although it appears that the calculation of damages is premised upon acceleration of the entire debt as of early 1999.
The trial on the first count of the counterclaim took place over six days in September 2007. The jury returned a verdict in favor of the Estate on September 17, 2007. McCann then moved before the trial court for reconsideration of the motion judge's calculation of damages. That motion was denied and final judgment was entered. This appeal followed.

II
On appeal, McCann seeks to overturn the motion judge's determinations that the Estate was entitled to summary judgment on its claim against him and on the second count of his counterclaim. McCann also argues that the trial judge erred in charging the jury that he had to prove his claim *40 against the Estate by clear and convincing evidence and by failing to charge the jury with respect to the requirements of the Rules of Professional Conduct, particularly RPC 1.17, concerning the extent of an attorney's obligation to give notice to clients when ownership of a law firm changes.

A
We turn first to that aspect of the appeal that seeks reversal of the order granting the Estate's summary judgment motion as to its claims arising out of the partnership agreement and the note. An appellate court reviews a grant of summary judgment de novo, applying the same standard governing the trial court under Rule 4:46. Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46, 916 A.2d 440 (2007). Generally, the court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995); see also R. 4:46-2(c).
McCann argues that the motion judge erred in holding that the oral representations he attributes to Chance concerning the amount actually due to him were barred by the parol evidence rule. We disagree. In Conway, supra, 187 N.J. at 268-69, 901 A.2d 341 (alterations in original), the Supreme Court discussed the parameters of the parol evidence rule as follows:
In general, the parol evidence rule prohibits the introduction of evidence that tends to alter an integrated written document. Restatement (Second) of Contracts § 213 (1981). Although the parol evidence rule is easily framed, it "is attended with confusion and obscurity which makes it the most discouraging subject in the whole field of evidence." 9 Wigmore on Evidence § 2400, at 4 (Chadbourn rev.1981). Not only is the parol evidence rule difficult to apply, it is a misnomer because it applies to documentary as well as oral evidence. See id. at 5. Moreover, we have noted that the parol evidence rule is a rule of substantive law, not a rule of evidence. Atl. Northern Airlines v. Schwimmer, 12 N.J. 293, 302, 96 A.2d 652 (1953); Restatement (Second) of Contracts § 213 cmt. a (1981).
Under Professor Williston's restrictive view, parol evidence may only be admitted if the language of the writing is unclear. See E. Allan Farnsworth, Contracts § 7.12, at 502-03 (1982) (citing Williston on Contracts § 95 (3d ed.1957)); Restatement (First) of Contracts § 230 cmt. a [(1932)]. Professor Corbin has advanced a more expansive view of the parol evidence rule, which was adopted in the Second Restatement of Contracts. That view provides that "[a]ntecedent and surrounding factors that throw light upon... [the meaning of the contract] may be proved by any kind of relevant evidence." 3 Corbin on Contracts § 579 (West 1960); see also Restatement (Second) of Contracts § 214 [(1981)] ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish ... the meaning of the writing, whether or not integrated.").
In this case, McCann sought to introduce parol evidence to vary a key provision of the partnership agreement, the amount *41 of money owed by him to Chance.[6] Because there is no ambiguity in the agreement as written with respect to that issue, there is no need for parol or extrinsic evidence to interpret it.
In Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301-02, 96 A.2d 652 (1953), the Supreme Court held:
The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writingnot for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said.
Simply put, McCann wishes to use parol evidence to demonstrate that, when the partnership agreement says that "there is due to Chance as of August 1, 1998, an amount of $630,000," it really means that Chance was owed $160,000. The parol evidence rule does not permit him to do so.
McCann also argues that he should have been permitted to support his defense of equitable fraud with his oral testimony concerning the representations made by Chance that he would only seek to collect $160,000 and that he wanted to use the $630,000 amount only for "tax purposes." Equitable fraud "requires proof of (1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party." Liebling v. Garden State Indem., 337 N.J.Super. 447, 453, 767 A.2d 515 (App.Div.) (citing Jewish Ctr. of Sussex Cty. v. Whale, 86 N.J. 619, 624, 432 A.2d 521 (1981)), certif. denied, 169 N.J. 606, 782 A.2d 424 (2001).
The essential issue here, however, concerns future payments by McCann to Chance, not existing or past facts at the time of the agreement. McCann is not alleging that Chance falsely and inaccurately represented that he was actually owed $630,000. He seeks to offer testimony concerning Chance's statements about his future actions, i.e., that he would only seek to collect $160,000 in the future. Consequently, the equitable defense claim is not viable as a matter of law.[7]
McCann also argues that the motion judge erred in granting summary judgment in favor of the Estate on its claims against him in light of his argument that Chance's own alleged breach of the partnership agreement excused McCann's further performance. See Ingrassia Const. Co., Inc. v. Vernon Twp. Bd. of Educ., 345 N.J.Super. 130, 136-37, 784 A.2d 73 (App.Div.2001) ("[I]f `during the course of performance one party fails to perform "essential obligations under the *42 contract," he may be considered to have committed a material breach and the other party may elect to terminate it.'" (quoting Medivox Prod., Inc. v. Hoffmann-LaRoche, Inc., 107 N.J.Super. 47, 58-59, 256 A.2d 803 (Law Div.1969))). See also Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J.Super. 275, 285-86, 723 A.2d 976 (App. Div.1998) (citing Restatement (Second) of Contracts § 237 (1981)).
Where a contract calls for a series of acts over a long term, a material breach may arise upon a single occurrence or consistent recurrences which tend to "defeat the purpose of the contract." In applying the test of materiality to such contracts a court should evaluate "the ratio quantitatively which the breach bears to the contract as a whole, and secondly the degree of probability or improbability that such a breach will be repeated."
[Magnet, supra, 318 N.J.Super. at 286, 723 A.2d 976 (quoting Medivox Prod., supra, 107 N.J.Super. at 59, 256 A.2d 803).]
Whether conduct constitutes a material breach is ordinarily a question reserved for disposition by the jury. Lo Re v. Tel-Air Commc'ns, Inc., 200 N.J.Super. 59, 72-73, 490 A.2d 344 (App.Div.1985).
We note that, at the same time the motion judge rejected McCann's legal argument that such a material breach by Chance would excuse his further performance of the obligation to make payments to Chance, he denied the Estate's summary judgment motion with respect to the issue of whether there was, in fact, a breach by Chance. The judge did so because he found that there were genuine issues of material fact as to the alleged breach.
We believe that a rational jury could conclude that Chance's obligation to facilitate his clients' continued affiliation with his former law firm was a material obligation under the partnership agreement and that, if it were breached by Chance, some or all of McCann's future performance would have been excused. Whether Chance breached that obligation is a jury question, as the motion judge has already determined.
The jury must assess: (1) whether the compensation related to the best-efforts aspect of the agreement was "quantitatively" significant, as compared to the capital account adjustment; (2) whether Chance's breach, if there was one, was "material"; and (3) whether such a breach excused all future performance by McCann or only that portion of it that related to Chance's compensation for using his best efforts to have his clients continue with the firm after his retirement. Magnet Res., supra, 318 N.J.Super. at 286, 723 A.2d 976. In that context, the jury will also have to consider the significance, if any, of Chance's inaction after McCann stopped making payments in January 1999, as well as McCann's assertion that Chance acknowledged the breach and agreed not to seek further payments under the partnership agreement or note.
The mention of Chance's inaction brings us to the issue of laches, which McCann unsuccessfully raised as an affirmative defense in the Law Division and now raises on appeal. The Estate filed suit against McCann within the six-year period of limitations for an action on a contract. N.J.S.A. 2A:14-1. In refusing to apply laches, the motion judge looked at the time period between (1) the executors' discovery of the partnership agreement, note, and mortgage and (2) the filing of their complaint, and concluded that there was no inordinate delay. McCann argues, however, that the equitable doctrine of laches is applicable in this case because of Chance's own failure to take action on the alleged debt during his lifetime, specifically *43 the four-year period between the time McCann stopped making the monthly payment of $1,000 and the date of Chance's death.
Laches is an equitable doctrine that
is invoked to deny a party enforcement of a known right when the party engages in an inexcusable and unexplained delay in exercising that right to the prejudice of the other party. In re Kietur, 332 N.J.Super. 18, 28, 752 A.2d 799 (App.Div.2000) (citing County of Morris v. Fauver, 153 N.J. 80, 105, 707 A.2d 958 (1998)). Laches may only be enforced when the delaying party had sufficient opportunity to assert the right in the proper forum and the prejudiced party acted in good faith believing that the right had been abandoned. Dorchester Manor v. Borough of New Milford, 287 N.J.Super. 163, 172, 670 A.2d 600 (Law Div.1994), aff'd, 287 N.J.Super. 114, 670 A.2d 576 (App.Div.1996). The time constraints for the application of laches "are not fixed but are characteristically flexible." Lavin v. Bd. of Educ. of Hackensack, 90 N.J. 145, 151, 447 A.2d 516 (1982). The key factors to be considered in deciding whether to apply the doctrine are the length of the delay, the reasons for the delay, and the "changing conditions of either or both parties during the delay." Id. at 152, 447 A.2d 516. The core equitable concern in applying laches is whether a party has been harmed by the delay. Id. at 152-53, 447 A.2d 516.
[Knorr v. Smeal, 178 N.J. 169, 180-81, 836 A.2d 794 (2003).]
See also United States v. Scurry, 193 N.J. 492, 503-04, 940 A.2d 1164 (2008).
We note that Paragraph 22 of the partnership agreement provides that "[m]ere passage of time or delay in seeking a remedy shall not be construed as a waiver of any default." The application of laches, however, requires more than "mere" passage of time. See Hyland v. Simmons, 152 N.J.Super. 569, 576, 378 A.2d 260 (Ch.Div.1977), aff'd o.b., 163 N.J.Super. 137, 394 A.2d 376 (App.Div. 1978), certif. denied, 79 N.J. 479, 401 A.2d 234 (1979); Notaro v. Notaro, 38 N.J.Super. 311, 316, 118 A.2d 880 (Ch.Div.1955).
Laches is frequently described as "`an equitable defense that may be interposed in the absence of the statute of limitations.'" Borough of Princeton v. Bd. of Chosen Freeholders, 169 N.J. 135, 157, 777 A.2d 19 (2001) (quoting Nw. Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 140, 770 A.2d 233 (2001)); Citizens Voices Ass'n v. Collings Lakes Civic Ass'n, 396 N.J.Super. 432, 442, 934 A.2d 669 (App. Div.2007) (quoting the same language).
In Mancini v. Township of Teaneck, 179 N.J. 425, 432, 846 A.2d 596 (2004), the Court noted that it "typically" considers laches "in the absence of the statute of limitations." However, Mancini held that a laches defense is available in the context of those workplace sexual harassment cases under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -49, in which the doctrine of continuing violation works to extend the normal two-year statute of limitations. Mancini, supra, 179 N.J. at 430-32, 846 A.2d 596. Equitable principles are also routinely applied to extend statutory periods of limitations. See Price v. N.J. Mfrs. Ins. Co., 182 N.J. 519, 524-25, 867 A.2d 1181 (2005) ("Flexible applications of procedural statutes of limitations may be based on equitable principles, such as the discovery rule, e.g. Lopez v. Swyer, 62 N.J. 267, 300 A.2d 563 (1973), or estoppel, e.g., O'Keeffe v. Snyder, 83 N.J. 478, 416 A.2d 862 (1980)."); Negron v. Llarena, 156 N.J. 296, 300, 716 A.2d 1158 (1998).
*44 When there is both a legal and an equitable claim, "equity will generally follow the limitations statute." Lavin v. Bd. of Ed. of Hackensack, 90 N.J. 145, 152 n. 1, 447 A.2d 516 (1982). However, in Lavin, the Court added:
Because laches is an equitable principle aimed to promote justice, conditions or circumstances may make it inequitable to prosecute a claim after a period shorter than that fixed by the statute of limitations. Thus where there has been an unreasonable delay, laches has been applied to defeat a claim despite the fact that the time fixed by the analogous statute of limitations has not passed. Patterson v. Hewitt, 195 U.S. 309, 319, 25 S.Ct. 35, 37, 49 L.Ed. 214, 218 (1904). Even if the cause of action in this case were deemed to be similar to a claim for breach of contract, it would be appropriate to consider the applicability of laches.
[Ibid.]
While there are no "analogous" legal and equitable causes of action in this case, we are satisfied that the particular facts of this case warrant consideration of laches "to promote justice."
Consequently, we hold that this is the rare case in which an equitable defense of laches should be considered, despite the fact that the case was timely filed under the applicable statute of limitations. Chance had four years within which to bring suit against McCann for failing to make the monthly payments called for by the partnership agreement. There appears to be no explanation in the record for his failure to do so, other than McCann's testimony that Chance conceded that he had breached the agreement himself and agreed to seek no further payments.[8] McCann is significantly prejudiced by the fact that Chance is no longer living, both because Chance's testimony is no longer available and because McCann must now bear the enhanced burden of N.J.S.A. 2A:81-2 with respect to his own testimony about statements made by Chance. In addition, several other potential witnesses, including Chance's secretary and the banker involved in the refinancing, have passed away.
We note that, if McCann can satisfy the "clear and convincing" requirements of N.J.S.A. 2A:81-2, a jury could also determine that Chance's agreement not to pursue McCann after he stopped making the $1,000 weekly payments was either (1) a waiver, Knorr, supra, 178 N.J. at 177, 836 A.2d 794 ("Waiver is the voluntary and intentional relinquishment of a known right."); or (2) a basis for an equitable estoppel. Id. at 178, 836 A.2d 794 ("[T]o establish equitable estoppel, plaintiffs must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment."). Both of those affirmative defenses were raised in McCann's answer.
Because there must be a trial on the Estate's claims against McCann on remand, we do not reach the issue of the measure of damages should McCann be found to have breached the contract. The motion judge did not give the parties the opportunity to address the issue and did not articulate his reasons for basing damages on an acceleration of the payments in the absence of an acceleration clause. For those reasons, we express no view on the issue.
Consequently, we reverse the grant of summary judgment to the Estate on its claim against McCann and remand for trial. *45 At the remand trial, McCann will not be permitted to offer parol evidence to vary the provisions of the partnership agreement nor will he be permitted to pursue his defense of equitable fraud. He will, however, be allowed to pursue his defenses: (1) that Chance's own breach resulted in the termination of McCann's obligations to make further payments; (2) that the Estate's claim is barred by laches because of Chance's inaction;[9] (3) that there was a waiver; (4) that equitable estoppel is applicable; and (5) that in the event he is unsuccessful with his defenses, the payment of the obligation should not be accelerated.

B
We turn now to the dismissal by summary judgment of the second count of McCann's counterclaim. That claim alleged that Chance "improperly diverted monies from fees due and owing to the firm from Stow Creek Township for the years 1995 through 1998 directly into his own personal account." (Emphasis added).
The motion judge granted summary judgment, finding the agreement provided "for revenue to be separately received by [] Chance, the decedent, and very clearly sets forth those terms." We find no error in the motion judge's ruling.
Paragraph 7 of the partnership agreement provides:

From and after the effective date of this Agreement, January 1, 1994, Chance has not received any income and shall not share in the profits or losses, or be responsible for any obligations of the partnership of Chance & McCann. Nevertheless, he has received and may use remuneration for professional services performed by him on a case by case basis, provided expenses incurred therewith and paid by the Partnership shall be credited against the capital account of Chance.
[ (Emphasis added).]
Although McCann contends that his claim is only for fees generated prior to the execution of the agreement in July 1998, the contractual language quoted above clearly refers to the period after the agreement's effective date of January 1, 1994. Like the motion judge, we see nothing in the record on the motion demonstrating that there was any diversion of income by Chance prior to 1994. Consequently, we affirm the dismissal of count two of the counterclaim.

C
Finally, we turn McCann's appeal of the jury's verdict on count one of his counterclaim. As already noted, the motion judge found that there were genuine issues of material fact and held that the claim had to be tried. The jury found against McCann. He alleges that the verdict must be set aside because the trial judge (1) charged the jury that he had to prove his entire case by "clear and convincing" evidence and (2) failed to charge the jury that the Rules of Professional Conduct did not require Chance to write letters to his clients about his withdrawal from the firm, but instead left the issue to the argument of counsel and decision by the jury. We agree with McCann and, consequently, reverse the judgment of dismissal resulting from the jury verdict.
N.J.S.A. 2A:81-2 provides, in pertinent part, that

*46 when 1 party sues or is sued in a representative capacity, any other party who asserts a claim or an affirmative defense against such ... representative, supported by oral testimony of a promise, statement or act ... of the decedent, shall be required to establish the same by clear and convincing proof.
Relying on the statute, the trial court charged the jury that McCann had to prove his claim against Chance by "clear and convincing evidence." That charge was in keeping with our decision in Moran v. Estate of Pellegrino, 90 N.J.Super. 122, 124-25, 216 A.2d 406 (App.Div.1966). For the reasons that follow, however, we conclude that Moran states too categorical an interpretation of the statute and decline to follow it in this case.
In Denville Amusement Co. v. Fogelson, 84 N.J.Super. 164, 168-69, 201 A.2d 380 (App.Div.1964), after quoting the statute, we outlined the issue that is now before us, as follows:
It is manifest that the primary (and perhaps exclusive) thrust of this provision is to diminish the likelihood of feigned claims or defenses based upon transactions with a decedent where the decedent can no longer contradict them. It would appear that so stringent a standard of proof would not be necessary where such a claim or defense was predicated upon written evidence.
We did not need to resolve the issue in Denville Amusement, however, because we concluded that plaintiff was entitled to prevail under either standard. Ibid.
Two years later, in Moran, the panel determined that the "clear and convincing" standard should apply whenever oral statements of the decedent are used to support a claim, even if there are also writings that support it.
In Buska v. Aquinaldo, 84 N.J.Super. 577, 583-85, 202 A.2d 893 (1964), the court explained the approach of N.J.S.A. 2A:81-2:
The 1960 amendment ... expunged the testimonial disqualification of the survivor in all respects but "simultaneously establishes a burden of proof to establish the claim by clear and convincing proof." ... The oral testimony is not excluded even if given by an adverse party. But if oral testimony as to what decedent said or did is presented to support a claim or affirmative defense, then the burden is upon the survivor to prove his case by clear and convincing evidence....
... Instead of imposing an arbitrary requirement of corroboration, it has entrusted to the trier of facts the protection of the decedent's estate against claims and affirmative defenses supported by oral proof of the decedent's words or conduct. Under this rule the trier of facts is cautioned to be watchful against falsehoods, since decedent is not available to deny them.
It is beyond question that, absent the note introduced as evidence of the indebtedness, the trial judge was required to apply the clear and convincing standard of proof, that is, "a standard of proof falling somewhere between the ordinary civil and criminal standards." In Denville Amusement Co., Inc. v. Fogelson, 84 N.J.Super. 164, 168-69, 201 A.2d 380 (App.Div.1964), the court stated, "It would appear that so stringent a standard of proof would not be necessary where such a claim or defense was predicated upon written evidence." However, it found it unnecessary to answer the question "whether this section applies only to cases where oral testimony is the sole proof offered, or applies to all cases wherein there is any oral proof," because the trial court had properly found *47 the evidence in favor of the claimant clear and convincing.
It seems to us that the "clear and convincing" standard must be applied in all cases where the claim against the decedent's estate depends at least in part upon the truth of oral testimony of the promises or acts of decedent, even when written evidence has also been introduced. Unless plaintiff's claim can prevail on the basis of genuine written evidence alone, the more stringent burden of proof should be applied.
[Moran, supra, 90 N.J.Super. at 124-25, 216 A.2d 406 (internal citation omitted).]
We believe that a more nuanced approach is required. We agree with the Denville court that "the primary (and perhaps exclusive) thrust of this provision is to diminish the likelihood of feigned claims or defenses based upon transactions with a decedent where the decedent can no longer contradict them" and that "so stringent a standard of proof would not be necessary where such a claim or defense was predicated upon written evidence." Denville, supra, 84 N.J.Super. at 168-69, 201 A.2d 380.
While the statute was clearly enacted to prevent false claims by and against an estate, we find no reason to conclude that the Legislature intended to make it more difficult for a litigant to prove, or defend, such a claim when the litigant's case is based primarily on written evidence solely because some oral testimony concerning the statements of a decedent will enhance the proofs. Yet, that is previously the result of Moran's strict application of the language of N.J.S.A. 2A:81-2. When a statute's plain language would lead to "a result contrary to the intent of the Legislature, courts are not confined to a literal reading of that language." In re Return of Weapons to J.W.D., 149 N.J. 108, 115, 693 A.2d 92 (1997).
We hold that, at the remand trial, the trial judge must analyze the proofs and determine whether McCann has presented a prima facie case of breach of Chance's obligations under the partnership agreement, based on documentary evidence and without relying on oral testimony about Chance's statements or acts. If the trial judge concludes that McCann has presented a prima facie case, then the jury should only be charged that it must find "clear and convincing" evidence of statements or acts attributed to Chance by the oral testimony of McCann or others, but that otherwise the preponderance of the evidence standard is applicable to the cause of action. If the prima facie case itself depends upon oral testimony with respect to statements or acts by Chance, then the jury must be charged that the entire cause of action must be proven by clear and convincing evidence.
McCann also argues that the trial judge erred in refusing to charge the jury with respect to the issue of whether the Rules of Professional Conduct, specifically RPC 1.17, required Chance to send letters to the clients for whom he did work, as was argued by the Estate. We agree.
RPC 1.17 provides that "[a] lawyer or law firm may sell or purchase a law practice, including good will, if [certain] conditions are satisfied." One of those conditions is that:
Written notice is given to each of the seller's clients stating that the interest in the law practice is being transferred to the purchaser; that the client has the right to retain other counsel; that the client may take possession of the client's file and property; and that if no response to the notice is received within sixty days of the sending of such notice, or in the event the client's rights would *48 be prejudiced by a failure to act during that time, the purchaser may act on behalf of the client until otherwise notified by the client.
[Id. (c).]
However, RPC 1.17(f) provides that "[a]dmission to or withdrawal from a partnership,..., retirement plans and similar arrangements,... shall not be deemed a sale or purchase for purposes of this Rule."
Given the fact that Chance was retiring from the firm, and not selling his practice to a third party, RPC 1.17 did not require that he send letters to the firm's clients for whom he performed legal work. There were no issues of fact for the jury to decide in making that determination. Consequently, the trial judge erred in refusing to so charge.
Whether Chance actually breached the partnership agreement or some other obligation by sending out the letters at issue was, of course, a question for the jury. Nevertheless, the Estate should not have been permitted to argue to the jury that Chance was required to send them out by the Rules of Professional Conduct. We leave to the remand judge whether there is a factual or legal basis for the Estate to argue that Chance believed he was so obligated.

III
In summary, we reverse (1) the order granting summary judgment to the Estate on its claim against McCann, except as to equitable fraud, and (2) the dismissal of the first count of McCann's counterclaim. We remand those claims for trial consistent with this opinion. We affirm the order granting summary judgment to the Estate with respect to the second count of McCann's counterclaim.
Reversed in part, affirmed in part.
NOTES
[1] Because Chance was deceased by the time this litigation was commenced, most of the relevant facts in the record were supplied by McCann.
[2] According to the firm's financial statement for 1996 and 1997, Chance's capital account was $631,027 as of December 31, 1997.
[3] McCann asserts that he learned that the mortgage was recorded only after he submitted an application to refinance the property. The loan officer questioned both McCann and Chance about the recorded mortgage. McCann alleges that Chance told the loan officer that the mortgage was only recorded for tax purposes. The loan sought was, according to McCann, approved based on that information. The loan officer passed away prior to trial.
[4] The action was originally filed as a foreclosure action in the Chancery Division, but was eventually transferred to the Law Division as a suit for money damages.
[5] We understand from the oral argument before us that the basic dispute between the parties is whether the entire debt was properly accelerated upon the alleged 1999 default by McCann or whether McCann should have been required to bring his principal payments up to date, with accrued interest, and then required to continue the monthly payments. We note that the agreement, particularly Paragraph 10, does not contain any acceleration clause.
[6] Although the partnership agreement contains no integration clause, it is nevertheless an integrated contract as to its financial terms, which are clearly set forth in the agreement itself. See Restatement (Second) of Contacts § 209 (1981), stating:

(1) An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.
(2) Whether there is an integrated agreement is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule.
(3) Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression.
[7] If there were a viable claim for equitable fraud, McCann's use of Chance's alleged oral statements would be subject to N.J.S.A. 2A:81-2, which is discussed at length below.
[8] We should not be understood as suggesting that the Estate cannot seek to prove at trial that there was such an explanation if the facts so warrant.
[9] The determination on laches must be made by the trial judge, although that judge could seek the guidance of the jury trying the substantive issues as an advisory jury. See R. 4:35-2.