56 A.3d 890

L.A., AS PARENT AND LEGAL GUARDIAN OF S.A., A MINOR, AND L.A., INDIVIDUALLY, PLAINTIFF–APPELLANT, v. NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES;[1] NEW JERSEY DEPARTMENT OF HUMAN SERVICES, NOW KNOWN AS DEPARTMENT OF CHILDREN AND FAMILIES; KEVIN M. RYAN, FORMER COMMISSIONER; EILEEN CRUMMY, DIRECTOR OF DIVISION OF YOUTH AND FAMILY SERVICES; CHARLES VENTI, FORMER DIRECTOR OF DIVISION OF YOUTH AND FAMILY SERVICES; SHALONDA MARTIN; RICHARD KLEIN, ED.D.; CATHERINE HINES, CADS; GWENDOLYN ARMSTRONG; AUBREY LUTZ; ANDREA STOKES; MONICA DUDAK; AND PAULETTE TARICA, DEFENDANTS, AND JERSEY SHORE UNIVERSITY MEDICAL CENTER AND DANIEL YU, M.D., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 2, 2012—Decided November 16, 2012.

---

[1] Effective June 29, 2012, the Division was renamed the Division of Child Protection and Permanency. *L.* 2012, *c.* 16.

Before Judges ALVAREZ, WAUGH, and ST. JOHN.

*David A. Mazie* argued the cause for appellant (*Mazie Slater Katz & Freeman, LLC,* attorneys; *Mr. Mazie,* on the briefs).

*Richard A. Amdur* argued the cause for respondent Jersey Shore University Medical Center (*Amdur, Maggs & Shor, P.C.*, attorneys; *Mr. Amdur*, on the brief).

*Michael P. Opacki* argued the cause for respondent Daniel Yu (*Buckley Theroux Kline & Petraske, LLC*, attorneys; *Mr. Opacki*, on the brief).

The opinion of the court was delivered by

WAUGH, J.A.D.

Plaintiff L.A. (Linda[2]) appeals the Law Division's August 13, 2010 orders dismissing her claims, brought on behalf of her minor daughter S.A. (Sally), against defendants Daniel Yu, M.D., and Jersey Shore University Medical Center (Medical Center). We reverse.

I.

We discern the following facts and procedural history from the record on appeal.

A.

Sally was born on November 5, 1998. She was abandoned by her biological mother in September 1999, at which time the Division of Youth and Family Services (DYFS) assumed custody and placed her in a foster home. In November 2000, DYFS approved placement of Sally with her biological father, K.L. (Ken).

At 8:00 p.m. on the evening of January 13, 2001, unidentified relatives brought two-year-old Sally to the Medical Center's emergency department. They told the triage nurse that Sally had been "vomiting" and had an "unsteady gait." They told another nurse that Sally had been "unable to walk." The second nurse observed

---

[2] We use pseudonyms to refer to plaintiff, the child, and individuals involved in the underlying abuse and neglect case for the purposes of preserving confidentiality and for clarity.

Sally to be "very lethargic and weak on arrival to ER with unusual odor on breath." The relatives told the nurse that they had been "called to [Sally's] house by [her] step-mother." Sally was registered as "Jane Doe" and immediately taken into the emergency room.

Yu examined Sally, noting a "cologne smell" and a "smell of chemical alcohol" from her mouth. He checked her breathing and pulse, looked for metabolic disorders, ingestion, and bleeding, and checked her mucous membranes, neck, heart, lungs, abdomen, extremities, and skin. Yu ordered blood work, a chest x-ray, a urinalysis, a blood-sugar check, and a test for carbon monoxide. He put Sally on a saline IV to prevent dehydration. Sally was also seen by a pediatric resident.

Test results received at 8:33 p.m. showed that Sally's blood alcohol level was 0.035 percent. At about the same time, Ken arrived at the hospital. He showed Yu a container of cologne, which he said Sally might have ingested. The records do not reflect that he gave Yu any information concerning how Sally had ingested cologne or any other form of alcohol. At 8:45 p.m., the emergency department's records were updated with Sally's name and date of birth, as well as her father's name and address.

Based on the results of the lab tests, the odor detected on Sally's breath, and Ken's presentation of the cologne, Yu concluded that Sally had ingested cologne. Although Yu recorded "cologne presented," neither he nor any Medical Center employee noted the type of cologne, its alcohol concentration, or the volume and contents of the container. Similarly, there were no notes concerning the circumstances under which Sally had accessed the cologne or who, if anyone, had been with her at the time.

By 9:30 p.m., Sally was "more alert" and "able to stand." Ken remained with her. At 11:20 p.m., Sally was alert, "tolerating oral fluids," and "able to ambulate with steady gait." Yu approved her discharge. Ken took her home at 11:30 p.m. Yu did not report Sally's January 13, 2001 emergency room visit to DYFS.

## B.

DYFS caseworker Andrea Stokes made three visits to Ken's home in late January and early February 2001. Those visits were related to DYFS's ongoing monitoring of Sally's placement with Ken. On January 24, Ken was not home, so Stokes spoke to his "girlfriend," who lived with Ken and helped look after Sally. She did not tell Stokes about the recent emergency room visit.

During a home visit on January 31, Ken told Stokes he had taken Sally "to the hospital because she was sick," apparently referring to the emergency visit described above. DYFS did not follow up on that information. Stokes observed Sally during that visit and a February 7 home visit.

On February 23, Sally was treated for burns by another physician. He did not report the incident to DYFS. However, on March 1, DYFS received a report that Sally had been burned. On March 15, DYFS received another report that Sally was being burned and beaten. Although those allegations were substantiated on March 16, Sally was not removed from Ken's custody at that time.

On April 5, DYFS investigated a third report that Sally was being physically abused. That report was also substantiated, and Sally was finally removed from Ken's home. A medical examination revealed "multiple burns to [Sally's] lower extremities, vaginal area and back; a loop shaped welt mark to her left chest; and multiple bruises to her lower back."

In June 2005, DYFS arranged for Sally to spend weekends with Linda as a potential adoption placement. She began living full time with Linda in July. Linda adopted Sally in April 2006.

## C.

In April 2007, Linda, as Sally's parent and legal guardian, filed suit against Yu and the Medical Center, as well as DYFS and other parties. Count seven of the complaint alleged that Yu had committed medical malpractice by failing to report Sally's emer-

gency room visit to DYFS and by otherwise breaching the appropriate standard of care when he treated Sally on January 13, 2001. Linda also alleged that the Medical Center was liable for Yu's actions under the doctrine of respondeat superior.[3]

After discovery had been taken, Yu moved for summary judgment in April 2010. Following oral argument on August 6, the motion judge delivered a brief oral decision granting summary judgment to Yu. After setting forth the basic facts, the judge explained his reasons as follows:

> [T]he basis for plaintiff's allegation of negligence with regard to Dr. Yu rests upon *N.J.S.A.* 9:6–8.10 and that section reads as follows. "Any person having reasonable cause to believe that a child has been subjected to child abuse, or acts of child abuse, shall report the same immediately to the Division of Youth and Family Services by telephone or otherwise." It's contended by Dr. Yu that he did not have reasonable cause to believe that the child had been subjected to child abuse, and, also, that there is no showing of proximate cause that led to the injuries complained of by the child.
>
> Here, the Court agrees with Dr. Yu that no reasonabl[e] jury could find that there was reasonable cause to believe that child abuse had been committed against [Sally] or that … she—had been subject to child abuse. When presenting at the hospital, the doctor found a smell of cologne, a report of ingestion of alcohol, an unsteady gait, vomiting. He described the amount as a rather small amount of alcohol. In addition, there was a rather quick recovery of the child. The child was released by 11:00 that evening.
>
> As said during oral argument, the fact that a child ingests any type of substance, in and of itself, is not sufficient to present one with reasonable cause to believe that child abuse has been committed or that the child has been subjected to child abuse. Therefore, with regard to Dr. Yu, I'm going to grant the motion for summary judgment.

On August 13, 2010, the judge entered orders dismissing the claims against Yu and the Medical Center.[4] Linda's motion for reconsideration was denied on October 15.

---

[3] The complaint was amended to add an additional defendant not involved in this appeal.

[4] The parties apparently agreed that, because Sally's claims against the Medical Center were premised on Yu's liability, the Medical Center was also entitled to summary judgment without the necessity of a formal motion.

After resolution of the remaining claims, which included a substantial settlement with DYFS, this appeal followed.

## II.

On appeal, Linda contends that the motion judge erred by granting summary judgment, arguing that the issue of whether Yu violated the applicable standard of care by failing to report Sally's emergency room visit to DYFS should have been left to the jury.

It is well-established that our review of the motion judge's conclusions of law is de novo. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."). We apply the same standard as the trial court under *Rule* 4:46–2(c). *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 539–40, 666 *A.*2d 146 (1995). In addressing a motion for summary judgment, a judge must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Id.* at 540, 666 *A.*2d 146, *quoted in Chance v. McCann,* 405 *N.J.Super.* 547, 563, 966 *A.*2d 29 (App.Div. 2009); *see also R.* 4:46–2(c).

To establish a prima facie case of medical malpractice, a plaintiff must establish "the applicable standard of care, that a deviation has occurred, and that the deviation proximately caused the injury." *Verdicchio v. Ricca,* 179 *N.J.* 1, 23, 843 *A.*2d 1042 (2004) (citations omitted). A physician has a "duty to exercise in the treatment of his [or her] patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession" in the physician's field. *Schueler v. Strelinger,* 43 *N.J.* 330, 344, 204 *A.*2d 577 (1964). "Failure to have and to use such skill and care toward the patient as a result of which injury or damage results constitutes negligence." *Ibid.*

 Before addressing the issue of whether the motion judge erred in granting summary judgment, we must clarify the nature of the standard of care. The parties agree, as did the motion judge, that the applicable standard of care is embodied in *N.J.S.A.* 9:6–8.10.[5] Unlike its predecessor, that statute is applicable to "any person" and not just health care providers. *See F.A. by P.A. v. W.J.F.*, 280 *N.J.Super.* 570, 576, 656 *A.2d* 43 (App.Div.1995).

*N.J.S.A.* 9:6–8.10 provides as follows: [6]

Any person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse shall report the same immediately to the Division of Child Protection and Permanency by telephone or otherwise. Such reports, where possible, shall contain the names and addresses of the child and his parent, guardian, or other person having custody and control of the child and, if known, the child's age, the nature and possible extent of the child's injuries, abuse or maltreatment, including any evidence of previous injuries, abuse or maltreatment, and any other information that the person believes may be helpful with respect to the child abuse and the identity of the perpetrator.

Linda interprets the statutory language as requiring reporting of "*all incidents which are potentially suspicious for child abuse or neglect.*" The statutory language itself, however, requires reporting only by someone who has "reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse." The plain language of the statute does not require reporting based solely on circumstances that are "potentially suspicious." We find it significant that, in *N.J.S.A.* 9:6–8.36a, the Legislature did require reporting of "all instances of suspected child abuse and neglect," but applied that mandate only to DYFS personnel reporting to the appropriate county prosecutor. Consequently, we reject Linda's contention that the standard of care applicable in this case requires the reporting of mere suspicions concerning child abuse.

---

[5] Linda's brief states that, "as the trial [judge] recognized during oral argument, there is no need in this case to have an expert define the standard of care" because "*N.J.S.A.* 9:6–8.10 sets forth the standard of care that applies to all persons."

[6] The statute was recently amended to reflect the Division's change of name.

*N.J.S.A.* 9:6–8.9 defines "abused child" and "child abuse" for the purposes of *N.J.S.A.* 9:6–8.10 as follows:

[A] child under the age of 18 years whose parent, guardian, or other person having his custody and control:

a. Inflicts or allows to be inflicted upon such child physical injury *by other than accidental means* which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ;

b. Creates or allows to be created a substantial or ongoing risk of physical injury to such child *by other than accidental means* which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; or

c. Commits or allows to be committed an act of sexual abuse against the child;

d. Or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of *the failure of his parent or guardian, or such other person having his custody and control, to exercise a minimum degree of care* (1) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (2) *in providing the child with proper supervision or guardianship,* by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment or using excessive physical restraint under circumstances which do not indicate that the child's behavior is harmful to himself, others or property; or by any other act of a similarly serious nature requiring the aid of the court;

e. Or a child who has been willfully abandoned by his parent or guardian, or such other person having his custody and control;

f. Or a child who is in an institution as defined in section 1 of *P.L.* 1974, c. 119 (C. 9.6–8.21) and (1) has been so placed inappropriately for a continued period of time with the knowledge that the placement has resulted and may continue to result in harm to the child's mental or physical well-being or (2) has been willfully isolated from ordinary social contact under circumstances which indicate emotional or social deprivation.

A child shall not be considered abused pursuant to subsection f. of this section if the acts or omissions described therein occur in a day school as defined in section 1 of *P.L.* 1974, c. 119 (C. 9:6–8.21).

[ (Emphasis added).]

██ We note that the quoted definitional language does not actually use the term "neglect," which might suggest that there is no statutory obligation to report negligent as opposed to abusive conduct. That interpretation might appear to be supported by the language of *N.J.S.A.* 9:6–8.8, which states that the purpose of the act "is to provide for the protection of children ... who have had

serious injury inflicted upon them by other than accidental means." Nevertheless for the reasons explained below, we conclude that *N.J.S.A.* 9:6–8.10 requires the reporting of injuries resulting from conduct that is reckless, or grossly or wantonly negligent, but not conduct that is merely negligent.

We reach that conclusion because the definition of "abused child" in *N.J.S.A.* 9:6–8.9 is essentially the same as the definition of "abused or neglected child" found at *N.J.S.A.* 9:6–8.21(c). The language in *N.J.S.A.* 9:6–8.21(c)(4) concerning failure "to exercise a minimum degree of care," which is virtually identical to the language of *N.J.S.A.* 9:6–8.9(d), has been interpreted by our Supreme Court as referring to "conduct that is grossly or wantonly negligent, but not necessarily intentional" and "reckless disregard for the safety of others." *Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B.*, 207 *N.J.* 294, 305–06, 24 *A.*3d 290 (2011) (quoting *G.S. v. Dep't of Human Servs.*, 157 *N.J.* 161, 177–79, 723 *A.*2d 612 (1999)). *See also N.J. Div. of Youth & Family Servs. v. S.N.W.*, 428 *N.J.Super.* 247, 254–56, 52 *A.*3d 200 (App.Div.2012). Such conduct can include failure to take a "cautionary act." *T.B., supra,* 207 *N.J.* at 306–07, 24 *A.*3d 290. Simple negligence, however, does not qualify as abuse or neglect. *Ibid.*

■ While we do not agree with Linda that mere suspicions must be reported, we conclude that the triggering of the obligation to report, especially in the context of civil litigation involving professional malpractice,[7] does not require the potential reporter to possess the quantum of proof necessary for an administrative or judicial finding of abuse or neglect. All that is required by *N.J.S.A.* 9:6–8.10 is "reasonable cause to believe."

---

[7] Failure to report as required by *N.J.S.A.* 9:6–8.10 is a disorderly persons offense punishable by incarceration for up to six months. *N.J.S.A.* 9:6–8.14, 2C:43–8. In a quasi-criminal context, of course, there must be proof beyond a reasonable doubt. *State v. Stas,* 212 *N.J.* 37, 52 n. 6, 50 *A.*3d 632 (2012); *In re Disciplinary Procedures of Phillips,* 117 *N.J.* 567, 575, 569 *A.*2d 807 (1990).

*N.J.S.A.* 9:6–8.16 authorizes an examining physician or hospital to take a child who has suffered "serious physical injury" into "protective custody" when

*the most probable inference from the medical and factual information supplied,* is that the said injury or injuries were inflicted upon the child by another person by other than accidental means, and the person suspected of inflicting, or permitting to be inflicted, the said injury upon the child, is a person into whose custody the child would normally be returned.

[ (Emphasis added).]

Sally's condition was not sufficiently severe to warrant the action authorized by that section. We note, however, that the section permits a physician or hospital to take immediate protective custody of a child using a "most probable inference" standard. We conclude that a modified version of that standard should inform the duty to make a report to DYFS under *N.J.S.A.* 9:6–8.10.

The purpose of the reporting requirement is to bring potential cases of abuse to the attention of DYFS for further investigation and, if required, emergent action and eventual adjudication. The "safety of the children" is of "paramount concern." *N.J.S.A.* 9:6–8.8(a). Consequently, we conclude that, in the context of a case in which the statutory language establishes a physician's standard of care, a physician has "reasonable cause to believe" that there has been abuse if a "probable inference" from the medical and factual information available to the physician is that the child's condition is the result of child abuse, including "reckless" or "grossly or wantonly negligent" conduct or inaction by a parent or caregiver. The inference need not be the "most probable," but it must be more than speculation or suspicion.

We now turn to the central question on appeal, whether this case was amenable to disposition on a motion for summary judgment. We are required, as was the motion judge, to give plaintiff all reasonable inferences based upon the facts in the record. *Chance, supra,* 405 *N.J.Super.* at 563, 966 *A.*2d 29.

Sally was admitted to the emergency room when she was only a few months past her second birthday, having consumed sufficient

alcohol to cause vomiting and to impair her ability to walk. She had a blood alcohol level of 0.035 percent when she arrived at the Medical Center, but the record does not contain any information concerning the amount of time that elapsed between her ingestion of alcohol and her arrival at the Medical Center. Even assuming she had gotten access to and consumed some cologne,[8] the record reflects no explanation of how a two-year-old child was able to access and consume sufficient cologne to cause Sally's medical symptoms, nor was there any information as to who, if anyone, had been supervising her at the time she did so.

Based on the record before the motion judge, we conclude that a reasonable jury could find that a probable inference from the information available to Yu at the time of treatment was that Sally's condition was the result of "reckless" or "grossly or wantonly negligent" conduct or inaction on the part of her parent or guardian, and that Yu breached the standard of care by failing to report the matter to DYFS for further investigation. For that reason, the complaint should not have been dismissed on summary judgment.[9]

Consequently, we reverse the order on appeal and remand for further proceedings consistent with this opinion.

Reversed and remanded.

---

[8] We are aware of no facts in the record to support a reasonable belief that Sally's exposure to alcohol was the result of deliberate conduct, as were the subsequent injuries inflicted by her father.

[9] We do not specifically rely on Linda's assertion that the relatives who brought Sally to the hospital did not know her name or other critical information, largely because that appears to have been more of an assumption by Linda's expert than a reasonable inference based upon facts in the record. The expert conceded in his deposition that it is not necessarily unusual for an emergency patient to be admitted as a Jane Doe to facilitate immediate treatment while the required information is being obtained. We note in that regard that the patient records were updated shortly after admission. However, that issue can be developed further on remand. In addition, we do not address the issues of proximate cause or damages, which were raised in Yu's motion but not addressed by the motion judge.