**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1280-19

BONEFISH CAPITAL, LLC,

     Plaintiff,

v.

AUTOSHRED, LLC, and
C. BRUCE RUSH, individually,

     Defendants-Respondents,

and

PELAS CAPITAL
MANAGEMENT, INC. d/b/a
WALKER FOREST, IMWOTH,
LLC d/b/a AUTOSHRED NJ, and
PETER LEVITT, individually,

     Defendants-Appellants,

and

K-2 PARTNERS, LLC, and
VLADIMIR R. VASAK, individually,

     Defendants.

_____

AUTOSHRED, LLC, and
CHARLES B. RUSH,

      Plaintiffs,

v.

IMWOTH, LLC, and PETER D.
LEVITT,

      Defendant.

_____

Submitted October 6, 2021 – Decided February 22, 2022

Before Judges Hoffman, Whipple, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket Nos. L-1782-16 and L-2804-17.

Brown McGarry Nimeroff, LLC, attorneys for appellants (Sigmund J. Fleck and Christopher Dolotosky, of counsel and on the briefs).

Mensching & Lucarini, PC, attorneys for respondents (John J. Mensching, on the brief).

PER CURIAM

Defendant-appellants Peter Levitt, Pelas Capital Management Inc. d/b/a Walker Forest, and Imwoth LLC d/b/a Autoshred NJ (the Levitt defendants) appeal from the denial, both on summary judgment and after a plenary hearing, of their claim seeking indemnification from defendants-respondents, Autoshred,

A-1280-19

LLC and its owner, C. Bruce Rush (the Rush defendants), under the terms of an Asset Purchase Agreement (APA).

The Levitt defendants also contend the trial court erred in granting summary judgment in favor of the Rush defendants on their breach of contract claim.[1]   Regarding that claim, the final judgment also required the Levitt defendants to pay attorney's fees and costs in the amount of $38,423.76.[2]   For the reasons that follow, we affirm as to the Rush defendants' breach of contract claim and the award of counsel fees relating to that breach; however, we vacate the denial of the Levitt defendants' indemnification claim and remand for further findings.

I.

We discern the following facts from the record.  In early 2016, defendant Peter Levitt, the owner of an executive recruiting business known as Pelas Capital Management Inc. d/b/a Walker Forest (Pelas), decided to exit the recruiting industry and purchase a document destruction company.  To this end,

---

[1]  This claim was based on the Levitt defendants' non-payment of a promissory note (the Note) issued pursuant to the APA.
[2]  After the Levitt defendants filed a supersedeas bond, the trial court entered an order staying any execution on the judgment pending resolution of this appeal.

A-1280-19

Levitt contacted a business broker named Vladimir Vasak of K-2 Partners, LLC (K-2), with whom Levitt had prior business dealings.

Coincidentally, Vasak had just learned that defendant-respondent C. Bruce Rush, a longstanding contact, was ready to sell his document destruction company, Autoshred LLC (Autoshred). On February 15, 2016, Vasak e-mailed Rush, advised that he might have a prospective buyer, and asked if they could update a prior non-disclosure agreement (NDA) and sign an engagement letter. Rush replied, informing Vasak that he was already working with an unnamed broker to sell Autoshred, but that he would talk to that broker to see if an arrangement could be made. Rush knew that he could not work with Vasak without that broker's "blessing."

The unnamed broker referenced by Rush was Paul Zaidins, the owner of plaintiff Bonefish Capital LLC (Bonefish), with whom Rush had an exclusive nation-wide brokerage agreement (the Bonefish Agreement), dated February 2, 2016, to sell Autoshred. Notably, the Bonefish Agreement, which remained in effect through June 30, 2016, included the following provision:

> [F]or a period of 90 days from termination, [Autoshred] shall remain obligated to pay 100% of Transaction Fees . . . for any transaction arranged, negotiated or introduced for [Autoshred] by Bonefish as illustrated by a formal offer presented in the form of a Letter of Intent (LOI). For a period of 91 days to 180 days from

4

termination, [Autoshred] shall remain obligated to pay 50% of Transaction Fees . . . for any transaction arranged, negotiated or introduced for [Autoshred] by Bonefish as illustrated by a formal offer presented in the form of a [LOI].

Bonefish's transaction fee was five percent of the sale price up to and including $1,575,000, plus eight percent of the sale price in excess of $1,575,001. Additionally, Rush was obligated to pay Bonefish's attorney's fees if Bonefish had to bring suit to enforce its rights under the agreement.

Rush subsequently contacted Zaidins to request a "carve-out" from the Bonefish Agreement so that he could engage Vasak for the sole purpose of presenting an offer from his prospective buyer, without breaching the Bonefish Agreement. According to Rush, Bonefish never would have found Vasak's prospective buyer because that buyer was not in any way associated with the document-destruction industry and was known only to Vasak. While Rush claimed that Zaidins consented to his request,[3] Zaidins denied the existence of any such verbal agreement. Zaidins continued to work on Rush's behalf for a deal with other potential buyers, including a company named Stericycle.

On March 7, 2016, Rush formally engaged K-2 and Vasak to pursue a possible sale of Autoshred to Levitt and Pelas; thereafter, the parties executed

---

[3] The alleged amendment was not in writing, contrary to the Bonefish agreement.

A-1280-19

an NDA. Vasak proceeded to act as an intermediary between Rush and Levitt. Vasak informed Levitt that Rush was also utilizing the services of an additional unnamed broker, and that, per Rush, other unnamed firms were interested in buying Autoshred.

### A.  Levitt Letter of Intent

On May 9, 2016, Levitt, on behalf of Pelas, submitted an LOI to purchase Autoshred's assets for $1,700,000. Rush signed the LOI, and then he and Levitt spoke directly for the first time, and it appeared the parties had a deal. Nevertheless, Rush subsequently contacted Zaidins and pressed him to find out whether Stericycle was going to make an offer. According to Zaidins, this was when Rush admitted to him that he had breached the Bonefish exclusivity agreement and had signed an LOI with another broker's buyer.

On May 11, 2016, Levitt and Rush met in person for the first time, over lunch. During the meal, Rush showed Levitt an unsigned draft LOI he had received from Stericycle that morning offering to purchase Autoshred for $2,000,000. Rush said that he was considering this offer. Levitt understood that Rush wanted a better offer from him, notwithstanding their signed LOI.

As a result, Levitt submitted a revised LOI that same day, wherein he increased his offer to $1,754,000. After speaking with Rush and in the interests

A-1280-19

of closing the deal, Vasak also agreed to reduce his commission by $25,000 thereby sweetening the deal by a total of $79,000. Rush, who did not like some of the terms of the Stericycle unsigned draft LOI, accepted Levitt's offer on May 12, 2016, and the parties set a closing date of July 15, 2016.

B. Bonefish demand

On May 19, and June 20, 2016, Bonefish sent letters to Rush asserting that he had breached the Bonefish Agreement by pursuing potential buyers for Autoshred without Bonefish's assistance, and demanding payment of a transaction fee in the amount of $112,750. Rush refused to make this payment, which he described as a "shakedown." Rush claimed that he told Vasak at this time about the May and June letters and that Bonefish was trying to collect a fee for "services that were not completed." Rush told other business associates that Zaidins broke his word about the carve-out and was a "real dirt bag." At his deposition, Rush stated that Zaidins should have tried to work something out with Vasak if he had "some contention."

On July 5, 2016, Bonefish filed a complaint under Docket No. L-1782-16 against Rush and Autoshred, alleging: 1) breach of contract; 2) violation of the covenant of good faith and fair dealing; 3) unjust enrichment; and 4) interference with prospective economic advantage. Bonefish sought damages and counsel

A-1280-19

fees.  Bonefish also included in its complaint several counts alleging tort and conspiracy claims against the unknown prospective buyer of Autoshred and its broker.

On July 11, 2016, Rush's counsel sent Levitt's counsel an e-mail addressing the terms of their deal and also advising for the first time of the June (but not the May) demand letter from Bonefish.  Counsel wrote that Autoshred

> has received correspondence threatening litigation by [Bonefish] in connection with this transaction. Bonefish is another business broker firm from Dallas, Texas.  Bonefish alleges that Autoshred had an exclusive broker agreement to utilize its services as the sole agent to solicit and present an LOI for the sale of the business.  Bonefish also has threatened claims against "the buyer of the Competing LOI for tortious interference with Bonefish's contractual relations and unlawful interference with prospective economic advantage."

He attached a copy of the letter to his e-mail.

After Levitt, who had no prior knowledge of the names Bonefish and Zaidins, read the e-mail and letter, he called Rush for an explanation, specifically asking if he was going to be sued.  According to Levitt, Rush responded that the dispute with Bonefish "should not concern" Levitt because of the "verbal carve-out" from the Bonefish exclusivity agreement, and that Bonefish's claim against Rush was without merit and that there was no risk to

A-1280-19

Levitt in proceeding to closing on the APA.[4]  Per Levitt, Rush further stated that Levitt was also protected by the indemnification provision in their draft APA.

Rush acknowledged that Levitt had testified to the former statement allegedly made by him (without confirming or denying whether he actually made the statement); however, he denied making the latter statement regarding the indemnification provision because the APA was still in draft form.  He did not recall any communication with Levitt regarding the Bonefish complaint.  Rush knew that Levitt and Vasak had not acted to intentionally harm Bonefish.

Levitt forwarded the e-mail and attached letter to Vasak, who assured Levitt that he would be protected by the indemnification provision.  In Vasak's view:   1) Levitt was not involved because he had nothing to do with the arrangement between Rush and Bonefish; 2) there was no reason to doubt Rush's assurances that there was a carve-out with respect to K-2 and Levitt; and 3) in any event, the tail in the Bonefish Agreement only applied to post-termination deals that had been negotiated, arranged or introduced by Bonefish, and the deal with Pelas did not qualify.

---

[4] Zaidins understood that Rush told Levitt that Bonefish did not have a valid claim.

On July 13, 2016, Levitt's counsel sent an e-mail to Rush's counsel, advising that Levitt, who had now read the Bonefish complaint, consented to Rush's request that they postpone the closing so that Rush could have additional time to resolve the dispute with Bonefish. Rush claimed not to remember this. According to Vasak, Rush also asked Vasak to contribute some of his transaction fee towards a settlement offer to Bonefish. Rush later claimed not to remember who came up with this idea but acknowledged that he was interested in reaching a compromise with Zaidins. In any event, in an agreement with Rush dated July 18, 2016, Vasak agreed to place $10,000 in escrow for this purpose.

C.    July 20, 2016, closing

On July 20, 2016, Pelas assigned its rights under the LOI to Imwoth LLC (Imwoth), an entity created by Levitt prior to the sale specifically for the purchase of Autoshred.[5] That same day, Imwoth completed the purchase of Autoshred's assets, which included two trucks. The APA between Autoshred, Rush and Imwoth provided that Imwoth would pay $1,525,000 in cash to Autoshred and execute the Note for the remaining balance of $229,000. Imwoth granted Autoshred a first lien/security interest in the trucks as collateral security.

---

[5] Levitt dissolved Pelas in the first quarter of 2017.

Levitt, as Imwoth's principal member, signed a personal Guaranty as collateral security for Imwoth's performance.

1. APA

The APA contains several provisions important to this case. Section 7.10 provides that "[n]either the Seller nor anyone acting on its behalf has incurred any liability or obligation to any broker, finder or agent for any brokerage fees, finder's fees or commissions with respect to the transactions contemplated by this Agreement for which the Buyer shall be responsible in whole or in part."

Section 13.02 of the APA contained an indemnification provision that states:

> 13.02 Indemnity by the Seller. The Seller agrees to unconditionally indemnify and hold harmless the Buyer and its successors . . . on demand, in each case past, present, or as they may exist at any time after the date of this Agreement (the "Buyer Indemnitees") against and in respect of any and all claims, suits, actions, proceedings (formal and informal), investigations, judgments, deficiencies, damages, settlements, liabilities, losses, costs and legal and other expenses arising out of or based upon:
>
> (a) any breach of any representation, warranty, covenant or agreement of the Seller contained in this Agreement or in any other Transaction Documents executed and delivered by the Seller; and
>
> (b) losses, liabilities, deficiencies, penalties, interest, claims, damages, actions, suits, proceedings,

11

settlements, judgments, costs and expenses (including reasonable attorneys' fees) arising out of, in connection with or incident to:

(i) any breach by the Seller of any covenant, promise, agreement, representation and/or warranty contained in this Agreement;

(ii) any false, incorrect or misleading representation or warranty or breach thereof made by or on behalf of the Seller or any Owner in this Agreement . . . or in any of the Transaction Documents;

. . . .

(iv) any and all debts, liabilities, obligations and duties of the Seller of any nature whatsoever, including any liabilities which arise from or relate to any property, Business, occupation, withholding or similar taxes, and any interest or penalty thereof, prior to the Closing Date, whether known or unknown and not expressly assumed by the Buyer pursuant to this Agreement, and any and all actions and conduct by or on behalf of the Seller or its employees, contractors or agents which occurred on or prior to the Closing Date;

(v) any attempt (whether or not successful) by any third party to cause or require the Buyer to pay any liability of, or claim against, the Seller of any kind in respect to the operation of the Business prior to the Closing Date, including, without limitation, any of the Excluded Liabilities.

A-1280-19

Pursuant to Section 13.04 entitled "Defense of Claims":

Any Buyer Indemnitee or Seller Indemnitee (the "Indemnified Party") seeking indemnification under this Agreement shall give to the party obligated to provide indemnification to such Indemnified Party (the "Indemnitor") a written notice (a "Claim Notice") describing in reasonable detail the facts giving rise to any claim for indemnification hereunder promptly upon learning of the existence of such claim.

(a) Third Party Claims. The obligations and liabilities of an Indemnifying Party under this Section 13 with respect to claims of any third party which are subject to the indemnification provided for in this Section 13 ("Third Party Claims") shall be governed by and contingent upon the following additional terms and conditions:

(i) Upon receipt by the Indemnitor of a Claim Notice from an Indemnified Party with respect to any claim of a third party, such Indemnitor may assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party and, in such event, shall agree to pay and otherwise discharge with the Indemnitor's own assets all judgments, deficiencies, damages, settlements, liabilities, losses, costs and legal and other expenses related thereto; and the Indemnified Party shall cooperate in the defense or prosecution thereof and shall, at the Indemnitor's expense, furnish such records, information and testimony and attend all such conferences, discovery

A-1280-19

proceedings, hearings, trials and appeals as reasonably may be requested in connection therewith. If the Indemnitor does not assume the defense thereof, the Indemnitor shall similarly cooperate with the Indemnified Party in such defense or prosecution. If it would be detrimental to the defense of the Indemnified Party for the same counsel to represent both the Indemnified Party and the Indemnitor, then the Indemnified Party shall be entitled to retain its own counsel, . . . at the expense of the Indemnifying Party.

(ii) If the Indemnitor shall have failed to assume the defense of any claim in accordance with the provisions of this Section, then the Indemnified Party shall have the absolute right to control the defense of such claim and, if and when it is finally determined that the Indemnified Party is entitled to indemnification from the Indemnitor hereunder, the fees and expenses of the Indemnified Party's counsel shall be borne by the Indemnitor and paid by the Indemnitor to the Indemnified Party within five (5) business days of written demand therefor, but the Indemnitor shall be entitled, at its own expense, to participate in (but not control) such defense.

Pursuant to subsection (b) of Section 13.05 entitled "Limitations of Indemnity Obligations":

Notwithstanding any provision contained herein to the contrary, no Indemnified Party shall be entitled

14

to indemnification hereunder with respect to any false, incorrect or misleading representation or warranty in this Agreement (including the Exhibits and Schedules hereto) or in any of the transaction Documents or breach thereof made by an Indemnifying Party that such Indemnified Party had actual knowledge of on the closing Date, where such actual knowledge was acquired because of the events, circumstances and consequences thereof were clear on its face from materials actually provided to or obtained by the Indemnified Party prior to Closing.

## 2. Promissory Note

Under the Note, Imwoth promised to pay Autoshred $229,000 plus interest in twenty-five monthly payments with the final payment due on August 14, 2018. If Imwoth defaulted, Autoshred was authorized to: 1) declare the full amount outstanding immediately due, plus seven percent interest until full payment was made; and 2) recover its costs and fees, including reasonable attorney's fees, in enforcing its rights under the Note.

## 3. Guaranty

As collateral security for Imwoth's performance under the Note, Levitt executed a personal Guaranty, which provided, in pertinent part, as follows:

> 1. As a material inducement to the Lender [Autoshred] to make the Loan to the Borrower [Imwoth], with knowledge that the Lender is making the Loan in reliance upon this Guaranty, . . . and intending to be legally bound hereby, the undersigned, hereby guarantees as surety, absolutely and unconditionally, to

15

the Lender the prompt payment when due, whether at maturity, by acceleration or otherwise, or as the same may be renewed, modified or extended from time to time, of all indebtedness which the Borrower may now or hereafter owe to the Lender under the Promissory Note evidencing the Loan.

2. Payment hereunder shall be made in any coin or currency which, at the time of payment, is legal tender in the United States of America for public and private debts. The Guarantor further agrees that this Guaranty may be enforced by the Lender in accordance with the provisions hereof without first making demand upon or proceeding against the Borrower.

3. Except as otherwise provided herein, the Guarantor hereby waives notice of any of the Borrower's Obligations heretofore or hereafter incurred, or contracted or renewed or extended, and the Guarantor further waives: (i) notice of acceptance of this Guaranty by the Lender and any and all notices and demands of every kind which may be required to be given by any statute, rule or law, (ii) any defense, right of set-off or other claim which the Guarantor may have against the Borrower (until such time as the Borrower's Obligations to the Lender have been fully and completely satisfied), and (iii) presentment for payment, demand for payment (other than as provided for herein), notice of nonpayment or dishonor, protest and notice of protest, diligence in collection and any and all formalities which otherwise might be legally required to charge the Guarantor with liability.

4. This shall be an agreement of suretyship as well as a guaranty and the Guarantor agrees that this Guaranty may be enforced by the Lender without the necessity at any time of resorting to or exhausting any other security or collateral given in connection herewith or with the

16

Note through foreclosure or other proceedings or actions otherwise and recovery hereunder shall not be limited to such security or collateral.

5. Until this Guaranty shall terminate as herein set forth, the undersigned shall have no right of subrogation and waives any right to enforce any remedy which it now has or may hereafter have against the Borrower and any benefit of, and any right to participate in, any security now or hereafter held by the Lender.

6. Upon an Event of Default by the Borrower under the Promissory Note and the expiration of any grace periods applicable thereto, all existing and future indebtedness of the Borrower to the undersigned will be and is hereby subordinated to all of the Borrower's Obligations and, so long as this Guaranty is in effect, without the prior written consent of the Lender, shall not be paid or withdrawn in whole or in part.

7. The obligations of the undersigned hereunder are independent of the obligations of the Borrower and, in the event of any default hereunder, a separate action or actions may be brought and prosecuted against the undersigned whether or not the Borrower is joined therein or a separate action or actions is or are brought against the Borrower. The Lender may maintain successive actions for other defaults. The Lender's rights hereunder shall not be exhausted by the Lender's exercise of any of the Lender's rights or remedies or by any such action or by any number of successive actions until and unless all obligations hereby guaranteed have been fully performed.

8. This Guaranty is a present, continuing, absolute and unconditional guaranty and notice of its acceptance is waived.

17

A-1280-19

9. This Guaranty shall remain in full force and effect until full performance by the Borrower pursuant to all of the terms of the Promissory Note, at which time this Guaranty and the obligations of the Guarantor hereunder shall cease and determine without any further action by the parties hereto and the Lender shall thereafter promptly return this Guaranty to the Guarantor. No provision of this Guaranty or right of the Lender hereunder can be waived nor shall the undersigned be released from its obligations hereunder except as set forth in the preceding sentence.

. . . .

15. Except as provided in any other written agreement now or at any time hereafter in force between the Lender and the undersigned, this Guaranty shall constitute the entire agreement of the undersigned with the Lender with respect to the subject matter hereof and no representation, understanding, promise or condition concerning the subject matter hereof shall be binding upon the Lender unless expressed herein.

. . . .

21. THE GUARANTOR AND THE LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR COUNTERCLAIM ARISING IN CONNECTION WITH, OUT OF, OR OTHERWISE RELATING TO THE NOTE, THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT NOW OR HEREAFTER EXECUTED IN CONNECTION THEREWITH OR WITH THE LOAN.

A-1280-19

D.    Amended complaint in Bonefish action

On April 13, 2017, almost nine months after the closing, Bonefish filed an amended complaint wherein it added Levitt, Pelas, Imwoth, Vasak and K-2 to its action and asserted claims against them for:  1) tortious interference with prospective economic advantage; 2) tortious interference with contractual relations; and 3) civil conspiracy.  Zaidins later acknowledged that if Rush had paid him, he would have had no claim against the Levitt defendants.  In early May, Rush and Autoshred filed an amended answer to this complaint.

On May 16, 2017, Levitt and Imwoth made a formal demand for defense and indemnity from Autoshred under Sections 13.02(b)(iv) and (v) of the APA. Rush denied this request based upon Section 13.05(b) of the APA because Levitt had "actual knowledge" of Bonefish's potential claims against him and Imwoth prior to the July 20, 2016, closing.

As a result, on June 8, 2017, Levitt and Imwoth advised Rush that he was in breach of the APA, and that Levitt and Imwoth were going to "prophylactically" set-off their counsel fees in the Bonefish action against the remaining payments due on the Note.  Imwoth made its last payment under the Note on May 10, 2017, leaving a remaining principal balance of $136,627.57, and retained possession of the two trucks.

19

On July 28, 2017, Rush advised Levitt that Imwoth was in default on the Note and that he had elected to accelerate the loan obligation and declare the full amount due, with interest and costs and fees, plus return of the two trucks. On August 21, 2017, in a letter to Levitt's counsel, Rush's counsel reiterated that Section 13.05(b) was controlling and that contracts for indemnification were construed against the indemnitee and would not be construed to indemnify the indemnitee against losses resulting from its own tortious conduct.

On October 2, 2017, Levitt and Imwoth filed an answer to Bonefish's complaint. They also filed a five-count crossclaim against Rush and Autoshred seeking indemnification for any liability or legal fees incurred by them in the Bonefish action pursuant to Section 13.02 of the APA.[6] They demanded a trial by jury as to all issues.

Vasak and K-2 also filed an answer, wherein they asserted that Rush had assured K-2 that, while Autoshred had retained another broker, there was no problem with proceeding with the Pelas/Autoshred transaction. They also asserted a crossclaim against Rush and Autoshred.

On August 29, 2017, Rush and Autoshred filed an answer to Levitt and Imwoth's crossclaim. Then, on October 5, 2017, Rush and Autoshred filed a

---

[6] Levitt and Imwoth later abandoned counts III, IV and V of their crossclaim.

separate lawsuit against Levitt and Imwoth under Docket No. L-2804-17.  In their complaint, Rush and Autoshred asserted claims for:  1) breach of the Note by Imwoth; 2) breach of the Guaranty by Levitt; 3) replevin seeking the return of two trucks that Imwoth had acquired under the APA; and 4) conversion for Imwoth's wrongful possession of the trucks.

On November 10, 2017, Levitt and Imwoth filed an answer to this complaint, alleging as an affirmative defense that:  1) Rush and Autoshred had materially breached the APA by refusing to indemnify and defend Levitt and Imwoth in the Bonefish action; and 2) this breach excused the performance obligations of Imwoth and Levitt under the Note and Guaranty.  They demanded a jury trial.

Thereafter, Levitt and Imwoth filed a motion to dismiss Rush's complaint which the trial court denied by order dated March 20, 2018.  In that same order, the court consolidated the two actions under the docket number assigned to the Bonefish complaint and directed that "[d]efendants' request for [t]rial by jury is hereby stricken, defendants having waived same in open court on the record."

E.  Summary judgment motions

On June 19, 2018, the trial court denied Autoshred's first motion for summary judgment, finding that there was a genuine dispute as to whether the

A-1280-19

APA required Autoshred to defend and indemnify Levitt and Imwoth under the broad language in Section 13.02(a)(b)(v) referencing claims "arising out of, in connection with or incident to" Autoshred's business operations prior to closing. The court found that this language could arguably include the brokerage agreement between Autoshred and Bonefish, but that it was not entirely clear. The court noted that discovery was not complete and directed the parties to complete the depositions of Zaidins, Vasak, Levitt and Rush.

Thereafter, on October 31, 2018, Levitt and Imwoth filed a motion for summary judgment as to: 1) Bonefish's three tort claims against them; 2) their claim for indemnification and legal expenses against the Rush defendants; and 3) the Rush defendants' claims against them alleging breaches of the Note and the Guaranty, replevin and conversion. On November 20, 2018, the Rush defendants filed a cross-motion seeking summary judgment on the four claims they had asserted against Levitt and Imwoth.

In an order filed on February 25, 2019, with an accompanying opinion, the trial court: 1) granted summary judgment in favor of Levitt, Imwoth, Vasak and K-2 as to Bonefish's three tort claims and dismissed them with prejudice based upon Bonefish's failure to prove malicious intent or that defendants had acted in concert to commit an unlawful act or inflict injury on Bonefish; 2)

22

denied summary judgment to Levitt and Imwoth on their indemnification claim against Rush and Autoshred because there remained a genuine issue of fact as to whether Section 13.02(a)(b)(i) of the APA required Autoshred to defend and indemnify Levitt and Imwoth in the Bonefish action; and 3) granted summary judgment to Autoshred and Rush on their claims for breach of the Note and Guaranty by Imwoth and Levitt.[7]

The trial court ordered Levitt to pay Autoshred $146,191.50 (the remaining principal due on the Note plus interest) within forty-five days. It reserved ruling on Rush and Autoshred's claims for conversion and replevin, stating that it would dismiss these claims with prejudice if Levitt made timely payment to Autoshred. The court also directed counsel for Rush and Autoshred to submit an affidavit of services in support of an award of counsel fees and costs pursuant to the default provision of the Note.[8]

On March 8, 2019, Levitt and Imwoth filed a motion for reconsideration arguing that the trial court: 1) had prematurely granted summary judgment against them for a default on the Note and Guaranty because a jury could have

---

[7] On April 5, 2019, Rush and Autoshred entered into a stipulation of dismissal without prejudice as to all claims with Vasak and K-2.

[8] Counsel for Rush and Autoshred submitted an affidavit of services dated March 11, 2019, wherein he sought a counsel fee award of $38,423.76.

found that the Rush defendants' refusal to indemnify them under the APA excused their failure to perform; 2) had erred in finding that the Rush defendants did not materially breach the APA by failing to honor the indemnification provision; and 3) had erred in requiring Levitt to pay $146,191.50 within forty-five days because its order was interlocutory and not subject to execution pursuant to Rule 4:59. Rush and Autoshred filed a cross-motion for reconsideration of the trial court's ruling that the import of the indemnification provision could not be resolved on summary judgment. On April 18, 2019, the trial court entered an order with an accompanying opinion denying the motion for reconsideration filed by Rush and Autoshred as to the first two points raised; however, the court did grant the final request and extended the time period for payment of the amount due on the Note until forty-five days after entry of final judgment. The court also denied the Rush defendants' cross-motion for reconsideration.

F. Jury Trial and Bench Trial

On June 24, 2019, the day trial was to commence, the trial court decided, over the objections of the Levitt defendants, to sever Levitt and Imwoth's claim for indemnification and hold a plenary hearing on that claim on a later date. Counsel for Rush and Autoshred supported the court's decision, asserting that it

24

was for the court to interpret contracts of indemnification and that there was a court order stating that Levitt and Imwoth had waived their right to a jury trial.

The subsequent trial of Bonefish's claims against Rush and Autoshred resulted in a jury verdict finding Rush and Autoshred liable for breaching the Bonefish agreement. The jury awarded Bonefish $75,000; in addition, the court awarded Bonefish counsel fees of $57,504.42.

On August 20, 2019, the trial court held a bench trial solely on the claims of Levitt and Imwoth against Rush and Autoshred seeking indemnification and reimbursement of their legal expenses in the Bonefish action. At the trial, Levitt repeated his version of events through July 11, 2016, when he first learned of the Bonefish/Autoshred dispute. Levitt maintained that, during a phone call on July 11, Rush told him that he "had nothing to worry about" and that Levitt was protected by the indemnification language in the APA. Levitt stated that Vasak also offered his assurances.

Levitt confirmed that he did not ask for any changes to the APA based upon the Bonefish/Autoshred dispute prior to the closing. He stated that there was no further discussion about Bonefish prior to the closing. Rush did add to Section 7.06 of the APA the phrase "that have not been previously disclosed to

A-1280-19

the buyer." Levitt understood this to refer to Bonefish. Levitt claimed he had spent $170,000 to date defending himself.

Rush denied that he had any phone conversation with Levitt on July 11, 2016, let alone a conversation about the indemnification provision in the draft APA. Rush claimed he and Levitt did not talk about Bonefish at any point between July 11 and July 20 and had no e-mail communications on the subject. Additionally, Rush insisted that he and Levitt did not discuss the Bonefish claims or the indemnification provision of the APA at the closing.

G. Judgment

On September 17, 2019, the trial court issued a written opinion denying the Levitt defendants' claim for indemnification. On October 16, 2019, the trial court issued an order dismissing with prejudice the claims of Levitt and Imwoth against Rush and Autoshred. On the same date, the trial court entered judgment with an accompanying opinion ordering Levitt and Imwoth to pay: 1) $151,589.23 to the Rush defendants for the remaining amount of principal and interest due on the note; and 2) $38,423.76 in counsel fees. It directed that these amounts were due within forty-five days of the court's order, and that if Levitt and Imwoth failed to comply, it would consider the Rush defendants' remaining claims for conversion and replevin against the Levitt defendants.

## II.

On November 27, 2018, the Levitt defendants filed this appeal asserting six claims of trial court error. We address each argument in turn.

### A. Default on the Note and Guaranty

Levitt and Imwoth contend the trial court erred in prematurely granting summary judgment to the Rush defendants on their claim for default on the Note and Guaranty. They claim that a "jury may have determined that . . . Autoshred's refusal to indemnify the Levitt Defendants under the APA excused their performance obligations under the Note and Guaranty." They argue that the trial court erred in deeming inapplicable our decision in Chance v. McCann, 405 N.J. Super. 547 (App. Div. 2009). We disagree.

We review a grant of summary judgment de novo, applying the same standard governing the trial court under Rule 4:46. Liberty Surplus Ins. Corp. v. Nowell Amoroso P.A., 189 N.J. 436, 445-46 (2007); New Gold Equities Corp. v. Jaffe Spindler Co., 453 N.J. Super. 358, 372 (App. Div. 2018). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

Generally, the court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Ibid. A moving party is entitled to judgment as a matter of law when the evidence presented is so one-sided that it does not require submission to a jury. Id. at 533.

We review the interpretation of a contract de novo. Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011). In interpreting a contract, a court must try to ascertain the intention of the parties as revealed by the language used, the situation of the parties, the attendant circumstances, and the objects the parties were striving to attain. Matter of Cnty. of Atlantic, 230 N.J. 237, 254 (2017); Mantilla v. NC Mall Assocs., 167 N.J. 262, 272 (2001); Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J. Super. 78, 92-93 (App. Div. 2001); Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997). The judicial task is merely interpretive; it is not to rewrite for the parties a different or better contract. Kieffer, 205 N.J. at 222. To this end, a court must give contractual terms their plain and ordinary meaning. Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001).

A-1280-19

In granting summary judgment to Autoshred for the alleged default by Imwoth and Levitt on the Note and Guaranty, the trial court found that there was nothing in the Note indicating that Imwoth was excused from paying simply because it asserted entitlement to indemnification for damages and attorney's fees. Rather, when Imwoth stopped paying in May 2017, Imwoth defaulted on the terms of the Note.

The trial court also rejected Levitt's contention that he did not breach the Guaranty because there was no breach by Imwoth. In the court's view:

> In the present matter, this court agrees with Autoshred; Levitt did breach the Guaranty because their [sic] obligations arose when Imwoth defaulted on the Note. Additionally, the Guaranty provides an express waiver of any defense right of set-off, or other claim in which Levitt may have against Autoshred (¶ 3 of Guaranty). Not only did Levitt clearly sign the Guaranty, as evidenced on page five (5), the Guaranty is absolute and unconditional, and holds time is of the essence in respect to payment. As it is clear to the court that Levitt did not have a right to setoff, the outstanding balance and interest on the Note is due and owing.

In its decision denying reconsideration, the trial court provided this further explanation:

> In granting Autoshred's motion for summary judgment under the [N]ote and [G]uarant[y] however, the court has also determined that even if Autoshred breached the indemnification provision, Imwoth would not be relieved of its obligations of the underlying

29

transaction of the APA, i.e., the purchase of the Autoshred business. That transaction is now complete. Autoshred has sold all of its assets to Imwoth and Imwoth has fully paid Autoshred, in the form of cash and a promissory note, the full amount due. No claim is being advanced by Imwoth that the purchased assets were not as represented. Nor are the Imwoth defendant seeking recission of the underlying business sale.

Unlike the circumstance in the <u>Chance</u> case where there was a claim that one party did not perform its obligations under the essential contract, i.e., to promote the firm to existing clients, the Autoshred parties have, save for the still unresolved indemnification issue, fully performed its obligation under the APA. The asset transaction has closed- the assets have been delivered as promised and payment has been tendered and received. The indemnification issue, as indisputably intended by the parties, has survived the asset closing. Thus, in that sense the indemnification provision is severable from the underlying asset transaction. That is not unusual and [is] in fact common since whether indemnification is due from one party to another often dependent, as it would be here, on the outcome of the litigation.

There is no basis or even an attempt by Imwoth to unwind the asset transaction. Rather, Imwoth claims it has the right, by virtue of the unresolved indemnification provision to offset its potential damages against the amount due under the [N]ote; to essentially treat the [N]ote as a kind of escrow fund reserved to protect Imwoth against claims asserted by Bonefish. That right, however, does not exist by law or fact in this case and that is true even if its claims for indemnification are successful. The . . . [N]ote executed by Imwoth does not provide that it may be relieved of its obligation under the note in the event

30

Autoshred breached its obligation to indemnify Imwoth. The accompanying [G]uarant[y] signed by the principal, on the other hand specifically provides that the principal waives any right to an offset.

. . . .

If Imwoth wished that its obligations under the Note could be offset against the breach of Autoshred's indemnification duties, it should have ensured that the APA or the Note itself explicitly stated so. Neither do. As such, . . . the Levitt parties' motion . . . [is] hereby DENIED.

Before this court, Levitt and Imwoth renew their contention that the trial court erred in granting summary judgment to the Rush defendants on their claim for default on the Note and Guaranty. We disagree.

Preliminarily, we note that both the trial court in its decisions and Autoshred in its brief on appeal misstate to whom Levitt waived a right of set-off. According to paragraph three of the Guaranty, Levitt waived "any defense, right of set-off or other claim which the Guarantor may have against the Borrower (until such time as the Borrower's Obligations to the Lender have been fully and completely satisfied)." The "Borrower" was Imwoth, not Autoshred. As such, Levitt did not expressly waive a right of set-off against Autoshred.

Nevertheless, in reading the Guaranty, we do not discern how Levitt could have claimed a right of set-off in the event of a breach of the APA by Imwoth.

31

In the Guaranty, Levitt agreed:  1) "absolutely and unconditionally" to pay on demand to Autoshred whatever Imwoth owed under the Note; 2) that Autoshred could enforce the Guaranty without first proceeding against Imwoth; 3) that his obligations under the Guaranty were "independent of the obligations" of Imwoth; 4) that Autoshred could sue Levitt for breach of the Guaranty without joining Imwoth; 5) that no provision in the Guaranty could be waived, "nor shall the undersigned be released from its obligations hereunder" until full performance by Imwoth under the Note; and 6) that the Guaranty constituted the entire agreement between Levitt and Autoshred and that no other conditions applied unless expressed therein.

Thus, we are satisfied that Levitt did in fact breach the Guaranty, and that he should have paid Autoshred on demand after Imwoth stopped paying on the Note.  We do not find it relevant for purposes of the Guaranty whether Imwoth was in the right or in the wrong in stopping performance and claiming a right of set-off.  Levitt's obligations were separate and absolute.  As such, we affirm that portion of the trial court's order directing Levitt to pay the remaining balance on the Note plus interest, i.e., $151,589.23.

As to Imwoth's breach, both the APA and the Note are silent as to any right of Imwoth, upon an alleged breach of the APA by Autoshred, to stop

A-1280-19

payment under the Note and set-off its expenses in connection with the alleged breach against the amount owed. Rather, Section 13.04(a)(ii) of the APA provides that, in the event of a third-party claim against Imwoth, the fees and expenses of Imwoth's counsel shall be borne and paid by Autoshred "if and when it is finally determined that [Imwoth] is entitled to indemnification." The Note simply defines a "default" as Imwoth's failure to comply with any term of the Note whereupon Autoshred was authorized to accelerate all amounts due. We therefore conclude that Imwoth breached the Note by ceasing to pay Autoshred and engaging in self-help to ensure its counsel fees in the Bonefish case were paid prior to any determination that it was entitled to indemnification.

In making its argument, Imwoth relies upon Galpen v. Galpen, 221 N.J. Super. 532, 538-39 (Ch. Div. 1987), for the proposition that "[a] right of set-off exists between two parties each of whom under an independent contract owes an ascertained amount to the other and a claim for payment is made permitting each party to set-off his respective debt by way of mutual deduction against such a claim." Here, though, there are not two independent contracts as the Note was made an exhibit to the APA, and there was no "ascertained" amount due to Imwoth, but rather an alleged claim by Imwoth for an unspecified amount of money.

Additionally, we find that Imwoth's reliance upon the Chance case is unavailing since that case did not involve a third-party suit and a severable claim for indemnification, but instead dealt with an alleged breach of a primary material obligation by one of the parties to the at-issue agreement. Chance, 405 N.J. Super. at 566-67.

In sum, we reject the claims of Imwoth and Levitt that the trial court prematurely entered summary judgment against them on Autoshred's claims of default on the Note and Guaranty.

B. Summary Judgment - Indemnification

Levitt and Imwoth contend that the trial court erred by denying their motion for summary judgment on their claim for indemnification against Rush and Autoshred. We disagree, but for different reasons than those expressed by the trial court.[9]

"The objective in construing a contractual indemnity provision is the same as in construing any other part of a contract – it is to determine the intent of the

---

[9] See Hayes v. Delamotte, 231 N.J. 373, 387 (2018), "[I]t is well-settled that appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion." (quoting Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001)).

parties." New Gold, 453 N.J. Super. at 385 (quoting Kieffer, 205 N.J. at 222). The interpretation of a contract cannot be decided on summary judgment where there is uncertainty, ambiguity or the need for parol evidence to aid in interpretation. Serico v. Rothberg, 234 N.J. 168, 178 (2018). An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations. Nester, 301 N.J. Super. at 210.

An ambiguous indemnity provision must be "strictly construed against the indemnitee." Kieffer, 205 N.J. at 225; Mantilla, 167 N.J. at 272. Moreover, a contract will not be construed to indemnify the indemnitee against losses resulting from its own independent fault, active wrongdoing or tortious conduct, unless such an intention is expressed in unequivocal terms in the contract. Kieffer, 205 N.J. at 224; Mantilla, 167 N.J. at 269.

"In determining whether an action alleges 'active wrongdoing,' the '[a]llegations in the pleadings may be a starting point . . . , but the actual facts developed during trial should control.'" New Gold, 453 N.J. Super. at 387. Pursuant to this "after-the-fact" approach, an indemnitee may recover counsel fees "'so long as the indemnitee is [adjudicated] free from active wrongdoing regarding the injury to the plaintiff and has tendered the defense to the indemnitor at the start of the litigation.'" Mantilla, 167 N.J. at 271 (quoting

Central Motor Parts Corp. v. E.I. duPont deNemours, 251 N.J. Super. 5, 11 (App.

Div. 1991)).

In the portion of its February 25, 2019, opinion denying summary

judgment to Levitt and Imwoth on their indemnification claim against the Rush

defendants, the trial court found as follows:

> In the present matter, the court again finds that a genuine issue of fact exists as to whether the APA requires Autoshred to defend and indemnify Imwoth in the Bonefish litigation. Section 13.02(a)(b)(i) of the APA provides Autoshred "agrees to unconditionally indemnify and hold harmless Defendant Imwoth against any claims, suits, actions or proceedings . . . arising out of, in connection with or incident to any breach of any representation contained in the APA." The parties' additional discovery has not clarified in what instances the indemnification clause specifically and narrowly applies, nor has discovery made the phrasing of section 13.02 any less broad and ambiguous. As such, the question of whether the APA requires Autoshred to defend and indemnify Imwoth in the Bonefish litigation creates a genuine issue of fact that must be determined at the time of trial. Therefore, the Levitt defendants' motion for summary judgment is hereby DENIED as to contractual defense and indemnification.

In its April 18, 2019, opinion denying the Levitt defendants' motion for

reconsideration, the trial court first noted that the Levitt defendants argued that

the court had not considered the deposition testimony from Levitt and others, or

the fact that the indemnification provision already existed in the draft APA when

36

Levitt learned of the Bonefish demand letter on July 11, 2016. The court then reiterated that discovery had not made the phrasing of Section 13.02 any less broad or ambiguous, and that "[t]o make a definitive ruling on the defense and indemnification issue when the intent of the parties is so muddied would be against the basic tenets of Brill."

On appeal, Levitt and Imwoth renew their contention that Sections 13.02(b)(iv) and (v) of the APA clearly and unambiguously required the Rush defendants to defend and indemnify them for the expenses they incurred in the Bonefish action. They insist that the record before the trial court on summary judgment unequivocally showed that the Bonefish action arose solely as the result of the conduct of the Autoshred defendants prior to closing. Without yet taking into account the limiting provision of Section 13.05(b), we agree.

Based upon our review of the APA, we agree with the Levitt defendants that Section 13.02 is not ambiguous and that it allowed for indemnification by Autoshred in connection with the claims asserted by Bonefish. Bonefish's claims in the amended complaint clearly implicated Section 7.10 of the APA wherein the Rush defendants asserted that they had not incurred any liability to any broker for any brokerage fees with respect to the transaction contemplated by the APA for which Levitt and Imwoth shall be responsible in whole or in

A-1280-19

part. In Section 13.02, the Rush defendants agreed to unconditionally indemnify for any claims or liabilities, including legal expenses arising out of a breach of any representation in the APA.

Although the Rush defendants argued (and the trial court ultimately found in its decision following the plenary hearing) that indemnification was nonetheless precluded because Bonefish alleged tortious misconduct and conspiracy on the part of the Levitt defendants themselves, we cannot agree. It is true that the APA does not contain an unequivocal provision extending indemnification for active wrongdoing or tortious conduct on the part of the indemnitee. However, as noted by the Levitt defendants, the trial court granted summary judgment and dismissed Bonefish's claims against them, thus adjudicating them to be free from active wrongdoing under the after-the-fact approach in Mantilla and Central Auto Parts. Thus, the conduct of the Levitt defendants was no longer at issue at the time the court considered their motion for summary judgment on the indemnification provision. As previously noted, the pleadings in a case are only a starting point and an indemnitee may recover counsel fees from the indemnitor so long as the indemnitee is adjudicated free from active wrongdoing regarding the injury to the plaintiff. Thus, the Levitt

38

defendants were not precluded from indemnification because of Bonefish's tort and conspiracy claims alleged against them.

However, while we do not find Section 13.02 to be ambiguous or that the Levitt defendants were precluded from indemnification because of the nature of the Bonefish pleadings against them, we do conclude a question of fact remained as to whether Rush properly notified the Levitt defendants of the Bonefish action, given the conflicting deposition testimony of Levitt, Vasak, Rush and Zaidins.  As a result, we affirm the trial court's denial on summary judgment of the Levitt defendant's claim for indemnification.

C.  Denial of Indemnification after Plenary Hearing

Levitt and Imwoth also contend that the trial court erred in denying their claim for indemnification following the bench trial.  This argument has merit. We therefore vacate the dismissal of their indemnification claim and remand the matter to the trial court for additional findings.

In reviewing a trial court's conclusions in a non-jury case, we give substantial deference to the lower court's findings of fact and conclusions of law. Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort v. Inv. Ins. Co., 65 N.J. 474, 483-84 (1974)).  An appellate court should disturb these findings only where there is no doubt they are inconsistent with the relevant,

A-1280-19

credible evidence presented below, such that a manifest denial of justice would result from their preservation.  Ibid.  It is of no consequence that the reviewing court suspects that it might have reached a different result, or that all testimonial or evidentiary issues were resolved in favor of one side.  State v. Johnson, 42 N.J. 146, 162 (1964).

In its September 17, 2019, opinion denying the Levitt defendants' claim for indemnification, the trial court found as follows:

> Paragraph 13.02 of the APA governs the extent and nature of the indemnity by seller Autoshred to Buyer Imwoth.  This paragraph covers not only the liabilities of Autoshred but also "any and all claims, suits, actions, proceedings (formal and informal)." Clearly therefore this indemnity language would cover attorney fees and court costs incurred by Imwoth in connection with any litigation where a third party sued Imwoth for actions taken or liabilities incurred by Autoshred.
>
> However, while the language of the APA addresses that type of litigation, it does not address third party actions taken against Imwoth for its own actions or liabilities.  Here, all the claims made by Bonefish against Imwoth had to do with Imwoth's own alleged actions, e.g. Imwoth's tortious interference with the contract between Bonefish and Autoshred, its engaging in a civil conspiracy against Bonefish and the like.  If Imwoth wanted indemnification from Autoshred for its own actions, it was necessary to provide for the same in the APA.  Furthermore, Imwoth cannot reasonably claim that it was the intention of the parties to extend the indemnity to that extent.  As stated

above, Imwoth knew of Bonefish's claims against Autoshred before the closing and, more specifically, also knew that Bonefish intended to sue Imwoth for its own alleged actions and even knew the nature of the causes of action Bonefish intended to bring.

At the plenary hearing, Mr. Levitt confirmed he was aware of the likelihood of the Bonefish litigation and also that he and/or his company would be sued as well. It was incumbent on him then, if he wished to be indemnified for his or the company's own alleged actions, to have the contract amended to so provide. That was not done and the court cannot provide a more advantageous agreement for Imwoth than the one it negotiated with Autoshred.

The Levitt defendants argue that, in dismissing their claim after the plenary hearing, the trial court failed to make necessary credibility determinations and findings of fact given the conflicting deposition and trial testimony in this case. We agree as to the issue of whether Levitt was properly notified by Rush of the Bonefish action and had, at the time of the closing, "actual knowledge" of a breach of the APA as that phrase was defined in the APA.

Throughout this litigation, Rush and Autoshred maintained that subsection (b) of Section 13.05 negated the indemnification claim Levitt and Imwoth might otherwise have had because it precluded indemnification "with respect to any false, incorrect or misleading representation or warranty in this

Agreement . . . or in any of the transaction Documents or breach thereof made by an Indemnifying Party that such Indemnified Party had actual knowledge of on the closing Date." (emphasis added). According to the APA, this "actual knowledge" had to have been acquired "because of the events, circumstances and consequences thereof were clear on its face from materials actually provided to or obtained by the Indemnified Party prior to Closing."

Based on our review of the record, while counsel for Rush and Autoshred undeniably forwarded the Bonefish demand letter to Levitt prior to the closing, this did not necessarily mean that Levitt had "actual knowledge" of a breach by Rush since the "circumstances and consequences" of Bonefish's claims were arguably not made "clear" to Levitt. A significant portion of the record indicated that Rush denied the validity of Bonefish's "frivolous" claims at the time they were made known to Levitt. In both his deposition and hearing testimony, Levitt insisted that Rush told him that the dispute with Bonefish was without merit and "should not concern" Levitt because of the verbal carve-out. According to Vasak, Rush told him that Zaidins was trying to collect a fee for "services that were not completed" and in disregard of the carve-out. Rush admitted telling others that Zaidins was a "real dirt bag," who was breaking his word regarding the verbal carve-out and trying to "shake down" Rush.

The mutually corroborative testimony of Levitt, Vasak and Zaidins was juxtaposed against Rush's deposition and hearing testimony wherein he first did not recall conversing with Levitt about the Bonefish suit, and then maintained that he never discussed the ramifications of the suit or the indemnification clause in the APA with Levitt. Based on our review of the record, Rush's testimony defied belief. Levitt surely would have amended the APA to further protect himself, had he not been reassured that Rush would take care of him.

Thus, to the extent Rush disclosed a possible breach of Section 7.10 of the APA which assured that Rush and Autoshred had not incurred any liability to any broker for brokerage fees with respect to the sale of Autoshred for which Levitt and Imwoth would be responsible, he arguably also undercut this disclosure and the clarity of the consequences by indicating that the claim was frivolous. Levitt and Imwoth had no independent knowledge of the contract negotiated by Rush and Zaidins or of any amendments thereto. Even Zaidins admitted that he knew he had no independent claims against Levitt and Imwoth and that his suit rested upon Rush's actions.

Given the lack of findings by the trial court, especially on the issue of credibility, we vacate the denial of Imwoth's claim for indemnification, and

43

remand for more findings regarding the applicability of Section 13.05(b) of the indemnification provision.

### D. Waiver of Jury Trial

Levitt and Imwoth further contend that the trial court erred in denying their demand for a jury trial on their indemnification claim. They assert that, although there is a court order stating that they waived their right to a jury trial "in open court," this waiver applied only to the default claim asserted against them in Rush and Autoshred's complaint, not to their crossclaim for indemnification against the Rush defendants in the Bonefish action. We disagree.

We acknowledge that Levitt and Imwoth demanded a jury trial in their answer to the Bonefish complaint and in their crossclaim against the Rush defendants wherein they alleged that they were entitled to indemnification under the APA. Levitt and Imwoth similarly asserted as an affirmative defense in the Rush action that Rush breached the APA by failing to defend and indemnify them in the Bonefish complaint and demanded a jury trial. However, Levitt and Imwoth have produced nothing indicating that the jury trial waiver set forth in the trial court's order consolidating the two cases applied only to the Rush action.

As a result, we reject the Levitt defendants' contention that the trial court erred in denying their demand for a jury trial on their indemnification claim.

E. Hearing on Indemnification Claim

Levitt and Imwoth also contend that the trial court erred in holding a summary hearing under Rule 4:67-1 on their claim for indemnification. We disagree. The court held a plenary hearing/bench trial on a severed claim under Rule 4:35-3. There was no motion to convert the plenary hearing into a summary hearing. The parties did not agree to such a conversion. The Levitt defendants' contention to the contrary lacks merit.

F. Counsel Fees

Levitt and Imwoth next contend that the trial court erred in its counsel fee award to the Rush defendants based upon the fee-shifting provision in the Note. We disagree.

Each litigant in New Jersey is required to pay his own fees and costs, unless otherwise provided by court rule, statute or contract. In re Niles Trust, 176 N.J. 282, 294 (2003); Henderson v. Camden Cnty. Mun. Util. Auth., 176 N.J. 554, 564 (2003). The granting of counsel fees is a matter left to the trial court's discretion and fee determinations should be disturbed only where there has been a clear abuse of discretion. Giarusso v. Giarusso, 455 N.J. Super. 42,

51 (App. Div. 2018). A trial court decision will constitute an abuse of discretion where "the decision [was] made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Saffos v. Avaya Inc., 419 N.J. Super. 244, 271 (App. Div. 2011).

In making a fee award, a court must first calculate the "lodestar," i.e., "the number of hours reasonably expended multiplied by a reasonable hourly rate." Rendine v. Pantzer, 141 N.J. 292, 334-35 (1995). "Trial courts should not accept passively the submissions of counsel to support the lodestar amount" but should instead inquire as to what a reasonable amount of time expended should have been, as opposed to the hours actually expended by counsel. Id. at 335; Giarusso, 455 N.J. Super. at 51.

In determining the reasonableness of a fee application, the court must consider

> (1)[t]he time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or

lawyers performing the services; and (8) whether the fee is fixed or contingent.

[R.P.C. 1.5(a).]

The trial court can "'reduce the hours claimed by the number of hours spent litigating claims on which the party did not succeed and that were "distinct in all respects from" claims on which the party did succeed.'" Rendine, 141 N.J. at 335 (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)). It can also exclude time that is not explained in sufficient detail to determine its reasonableness. Rendine, 141 N.J. at 337. Ultimately, the final fee award need not be proportionate to the amount of damages recovered. Id. at 336.

According to Rule 1:7-4, a court in non-jury trials and on motions must "by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law." In particular, the court must give reasons when awarding attorney's fees. Gordon v. Rozenwald, 380 N.J. Super. 55, 79 (App. Div. 2005); Clarke v. Clarke ex rel. Costine, 359 N.J. Super. 562, 572 (App. Div. 2003). The absence of adequate findings will generally warrant a reversal of the lower court's decision. Heinl v. Heinl, 287 N.J. 337, 347 (App. Div. 1996).

After obtaining summary judgment on Autoshred's claim of default on the Note, counsel for Rush and Autoshred submitted a certification seeking

$38,423.87 in fees and costs based upon a fee of $350 per hour. Counsel acknowledged that there was some overlap with the Bonefish action, but asserted that he had tried to parse out what was billed in connection with the Imwoth default. He noted that "the entries relating to depositions set forth the total time spent, which included the Bonefish litigation. I have not included services relating to the depositions of Bonefish's representative (Zaidins) and the co-defendant broker (Vasak), and have only included one of three deposition transcript costs." Imwoth opposed such an award.

On October 16, 2019, the trial court entered judgment requiring the Levitt defendants to pay $38,423.76 (the full amount sought) to the Rush defendants pursuant to the fee-shifting provision in the Note. The court explained its award as follows:

> Initially, the court confirms that Autoshred is entitled to reasonable attorney fees and costs related to Imwoth's breach of the promissory note. The parties freely and clearly contracted to include a provision for the payment of such fees and costs in the event of a breach.
>
> Moreover, the court finds the total of 106.10 hours expended by Autoshred's attorney in pursuit of this matter were reasonable. All the billing entries appear to be related to Autoshred's suit on the promissory note. The hourly rate of $350.00 is commensurate with the rate of other attorneys of reasonably comparable skill, experience and reputation.

> Finally, the court finds the fee reasonable based upon the attorney's success on the merits. The fee of $37,135.00 in relation to the judgment on the note of $146,191.50 is appropriate.
>
> Accordingly, the court awards Autoshred attorney fees in the amount of $37,135.00 together with costs of $1288.76 as set forth in the affidavit of Autoshred's attorney for a total amount of $38,423.76.

Imwoth now contends that the trial court erred in awarding fees for: 1) the eighteen hours counsel spent attending the depositions of Rush and Levitt because those depositions were almost exclusively related to the Bonefish action; 2) travel time to the court house on seven occasions; 3) ten phone conferences with Rush between February 2017 and March 2019 for which the subject matter was not identified; and 4) preparing for and attending a two-day mediation where there was virtually no discussion of the Autoshred action against Imwoth and Levitt. We disagree.

First, counsel addressed the deposition overlap by charging for only two of the four depositions taken. Next, reimbursement for travel time is not inappropriate even if great distances were not involved. Also, ten brief phone calls generally discussing the case over a span of nearly two years resulting in fees of $840 hardly seems unreasonable. Lastly, given how the Bonefish and Rush actions were interwoven, we reject the contention that the court erred in

49

awarding fees for the mediation. We therefore reject the Levitt defendants' contention that the trial court erred in its counsel fee award.

Any claims not addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed, in part, and vacated and remanded, in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1280-19